PEOPLE v JENDRZEJEWSKI

Docket No. 103374. Argued January 14, 1997 (Calendar No. 13). Decided
July 29, 1997. Rehearing denied 456 Mich 1202.

Mark Jendrzejewski was convicted by a jury in the Gogebic Circuit
Court, Garfield W. Hood, J., of two counts of first-degree murder.
The defendant's motion for a change of venue had been denied.
The Court of Appeals, GRIFFIN, P.J., and SAWYER and R. L. ZIOLKOWSKI,
JJ., reversed in an unpublished opinion per curiam, finding that,
under the totality of the circumstances, the defendant was denied a
fair trial before impartial jurors because of pretrial publicity as
reflected in the number of jurors successfully challenged for cause
(Docket No. 168041). The people appeal.

In an opinion by Justice BOYLE, joined by Chief Justice MALLETT,
and Justices RILEY and KELLY, the Supreme Court *held*:

The pretrial publicity was not vicious, excessive, or officially
sponsored; the jurors were able to set aside any preconceived
notions of guilt; and there was insufficient evidence, direct or cir-
cumstantial, of a pattern of deep and bitter prejudice in the com-
munity to impeach the fairness of the seated jury. Under the total-
ity of the circumstances, the defendant was not denied a fair trial,
and, there was no abuse of discretion in the trial court's denial of
the defendant's motion for a change of venue.

1. Consideration of the quality and quantum of pretrial publicity,
standing alone, is not sufficient to require a change of venue. A
reviewing court also must closely examine the entire voir dire to
determine if an impartial jury was impaneled. A proper review
includes independent examination of the nature of the publicity
surrounding the trial, voir dire testimony of the venire as a whole,
and the individual voir dire testimony of the jurors eventually
seated. Generally, if a potential juror, under oath, can lay aside pre-
existing knowledge and opinions about the case, neither will be a
ground for reversal of a denial of a motion for a change of venue.

2. It is the policy of Michigan that prior impressions or opinions,
not positive in character, do not mandate disqualification. The
value protected by the Fourteenth Amendment is lack of partiality,
not an empty mind. The approach endorsed by the Court of
Appeals would discourage, rather than encourage the selection of a

jury as free as possible from extraneous taint from all sources. To suggest that by granting liberal use of challenges for cause a trial judge is creating a basis to challenge the verdict of a seated jury on the ground that it is not impartial would have the inevitable effect of curtailing the use of challenges for cause to only those that are clearly legally mandated.

Justice WEAVER concurred only in the result.

Vacated and remanded.

Justice BRICKLEY, joined by Justice CAVANAGH, dissenting, stated that the trial court abused its discretion in not granting the defendant's change of venue motion. When looked at under the totality of the circumstances, the defendant proved that the venire was prejudiced not only because of the local media reports, but on the basis of the jurors' previous relationship with the decedents or their family members. The record shows that the trial judge and the prosecutor recognized that the potential jurors had been influenced by the local media. In addition, the defendant demonstrated the existence of strong prejudicial community feelings, based on extensive publicity, community supposition, and rumors so pervasive and inflammatory that jurors could not expect to remain impartial when exposed to it.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Wayne M. Groat*, Prosecuting Attorney, and *J. Ronald Kaplansky*, Assistant Attorney General, for the people.

State Appellate Defender (by *Corinne Beckwith Yates*) for the defendant-appellee.

Amici Curiae:

*Paul J. Denenfeld* for the American Civil Liberties Union Fund of Michigan.

*Michael D. Thomas*, President, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Janice M. Joyce Bartee*, Assistant Prosecuting Attorney, for the Prosecuting Attorneys Association of Michigan.

BOYLE, J. The Court of Appeals reversed the defendant's conviction of first-degree murder, finding that, under the totality of the circumstances, as a result of pretrial publicity reflected in the number of jurors successfully challenged for cause, the defendant was denied a fair trial before impartial jurors. We granted leave to appeal to decide if the Court of Appeals erred in finding that the trial court abused its discretion in denying defendant's motion for change of venue.

The degree of pretrial publicity was not excessive, and its contents were not of a prejudicial nature. Nor did the percentage of array members excused for cause create a presumption of community bias. There is nothing in the record to indicate that the jury panel as constituted was unable to set aside any preconceived notions of guilt and render a verdict solely on the basis of the evidence presented. After an initial group voir dire, a thorough and probing sequestered voir dire to uncover potential juror bias was conducted with each prospective juror by the court and by trial counsel, and challenges for cause were liberally granted.

I would vacate the decision of the Court of Appeals and remand this case for determination of the defendant's remaining issues.

### I. FACTS AND PROCEDURE

The jury found defendant Mark Jendrzejewski guilty of two counts of first-degree murder for the shooting deaths of Bette Vernetti and Jeff Chlebowski. He was sentenced to mandatory terms of life in prison. Defendant was the only suspect in the shootings, and there was substantial circumstantial evi-

dence linking him to the crime. The case was tried in
Gogebic County, in which the small town of Besse-
mer, the vicinage community and site of the deaths, is
located. The victims, the defendant, and their respec-
tive families were known to many of the prospective
jurors, and there was newspaper, radio, and television
coverage of the crime.

The case was assigned to Gogebic Circuit Court
Judge Roy Gotham, who granted the defendant's
motion for disqualification on the basis of the defend-
ant's allegation that in sentencing the defendant in a
prior proceeding involving an assault on Bette
Vernetti, he stated that the defendant was a "danger-
ous human being."[1] Judge Garfield Hood was assigned
to preside over the trial. A defense motion for change
of venue was denied. Judge Hood acknowledged his
concern regarding the media influence on potential
jurors, but indicated that it was his duty to attempt to
seat a jury in Gogebic County.[2] With the input and
assistance of both prosecution and defense counsel,
the judge conducted a general group voir dire of each
of the three panels. The initial inquiries were directed
to whether any prospective juror was related to or
had a close acquaintance with the victims or their
families, the defendant or his family, the witnesses, or
the attorneys, and whether a prospective juror had an
opinion regarding credibility of the witnesses for
either side, was unable to be impartial, was unwilling
to follow the judge's instructions of law, or had per-

---

[1] This statement was reported in the local newspaper, *The Ironwood
Daily Globe,* see March 1 and 22, 1993.

[2] He told defense counsel, "[W]hat we're going to do is go ahead and
make every effort to select a fair and impartial jury here. If it's determined
that that can't take place, then of course, your motion will be granted."

sonal reasons requiring excuse from the panel. Following this inquiry and excusal of members of the array, the remaining venire persons were sequestered and defense counsel and the prosecutor conducted individual voir dire to determine the influence of pretrial publicity and any leaning the potential juror might harbor either for or against the defendant that had not been evident from the general group questioning.

From a pool of 119 potential jurors,[3] fourteen were selected. The jury deliberated for three days before finding the defendant guilty.

## II. ABUSE OF DISCRETION

It is the general rule that defendants must be tried in the county where the crime is committed.[4] An

---

[3] There were three panels of jurors: panel one with forty-nine, panel two with forty-one, and panel three with thirty-six. Three jurors remaining from the second panel had been added to thirty-three new jurors to make up the third panel. Five jurors counted in the third panel were never called for voir dire. One juror not counted in the panel totals was called, but dismissed because she had appeared on the wrong day for the wrong panel.

The plaintiff's appendix 63(a) through 91(a) indicates a total of 120 potential jurors. Plaintiff appears to have counted one juror twice.

[4] MCL 600.8312; MSA 27A.8312 in part provides:

(1) In a district of the first class, venue in criminal actions for violations of state law and all city, village, or township ordinances shall be in the county where the violation took place.

(2) In a district of the second class, venue in criminal actions for violations of state law and all city, village, or township ordinances shall be in the district where the violation took place.

(3) In a district of the third class, venue in criminal actions for violations of state law and all city, village, or township ordinances shall be in the political subdivision where the violation took place, except that when the violation is alleged to have taken place within a political subdivision where the court is not required to sit, the action may be tried in any political subdivision within the district where the court is required to sit.

exception to the rule provides that the court may, in special circumstances where justice demands or statute provides, change venue to another county.[5] A motion for change of venue is addressed to the discretion of the trial judge. "[T]he court's action in ordering such a change or refusing it is discretionary, and not to be disturbed on review, unless there clearly appears a palpable abuse of discretion." *People v Swift*, 172 Mich 473, 480; 138 NW 662 (1912).

Federal precedent has used two approaches to determine whether the failure to grant a change of venue is an abuse of discretion. Community prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that

---

On a federal level, this rule embodies historical roots reflected in constitutional provisions. Article III requires criminal trials take place in the state where the crime occurred, and the Sixth Amendment requires that impartial juries hear criminal cases in the state and district where the crime was committed. US Const, art III, § 2, cl 3; US Const, Am VI. The historical purpose behind the venue provisions was to protect defendants from governmental abuse and aid defendants' ability to provide witnesses and evidence. Tacit recognition was given to the relationship of the crime to the community and thus the vicinage community's interest therein. Gaines, *Race, venue and the Rodney King case: Can* Batson *save the vicinage community*? 73 U Det Mercy L R 271, 277-280 (1996). See *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

[5] MCL 762.7; MSA 28.850 provides in part:

Each court of record having jurisdiction of criminal cases upon good cause shown by either party may change the venue in any cause pending therein, and direct the issue to be tried in the circuit court of another county . . . and when there shall be a disagreement of the jury on the trial of any criminal cause in the circuit court to which such cause was ordered for trial, the circuit judge before whom the same was tried, if he shall deem that the public good requires the same, may, upon cause shown by either party, order and direct the issue to be tried in the circuit court of another county in the state . . . .

the entire jury pool was tainted, and, much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice. *United States v Angiulo*, 897 F2d 1169, 1181-1182 (CA 1, 1990). In the instant case, neither pretrial publicity, nor a statistical analysis supports the claim that defendant was deprived of a fair trial.

### III. PRETRIAL PUBLICITY

The Court of Appeals appears to have based its conclusion that defendant was deprived of a fair jury on the ground that extensive pretrial publicity had an adverse effect on this sparsely populated rural community. "The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors." *Irvin v Dowd*, 366 US 717, 722; 81 S Ct 1639; 6 L Ed 2d 751 (1961).[6] Thus, the initial question is whether the effect of pretrial publicity on a relatively small jury pool, all of Gogebic County, like all of Gibson County in *Irvin*, was such "unrelenting prejudicial pretrial publicity [that] the entire community will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue." *Mu'Min v Virginia*, 500 US 415, 442, n 3; 111 S Ct 1899; 114 L Ed 2d 493 (1991), citing *Irvin, supra* at 727-728.

---

[6] *Irvin, supra* at 724-725 states:

"Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." [Citation omitted.]

Juror exposure to information about a defendant's previous convictions or newspaper accounts of the crime for which he has been charged does not in itself establish a presumption that a defendant has been deprived of a fair trial by virtue of pretrial publicity. "To resolve [such a] case," a reviewing court "must turn . . . to any indications in the totality of circumstances that petitioner's trial was not fundamentally fair." *Murphy v Florida,* 421 US 794, 799; 95 S Ct 2031; 44 L Ed 2d 589 (1975). The Supreme Court has recognized the difficulty highly publicized cases present and the primary role of trial judges in these cases. In *Mu'Min v Virginia, supra* at 427, the Court acknowledged:

> [O]ur own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

The Court of Appeals asserted that "[i]t is undisputed that there was an enormous amount of pretrial publicity concerning this case . . . ." Unpublished opinion per curiam, issued April 6, 1995 (Docket No. 168041), slip op at 1. We disagree. Our independent review of the pretrial publicity does not lead to the conclusion that it was either extensive or prejudicial.

The definition of extensive publicity is necessarily relative. However, we cannot conclude as a matter of law that a community has been saturated with publicity by twenty newspaper articles published in *The Ironwood Daily Globe* on seventeen separate days over a period of seven months. Further, the record does not substantiate the dissent's posture that radio and television reports were pervasive to the extent that these broadcasts influenced the jury pool. Slip op at 7. The record reveals that while there was some limited television and radio coverage identifying the crime, the victims, and the defendant, the jury voir dire established that very few jurors had any discernable recall of what they had seen or heard on these broadcasts.

The actual amount, geographic scope, and the tenor of the publicity is neither extensive, intensive, nor potentially inflammatory[7] when compared to federal[8]

---

[7] This Court considered the issue as early as 1912 in *People v Swift*, *supra* at 479-481, a case in which the defendant requested a change of venue from Charlevoix County, a community of 20,000, because adverse public sentiment and prejudice had risen from alleged false and defamatory statements made against the defendant that were published in the local papers. The Court found:

> The [news] clippings, taken as a whole, seem to be such as are often found in local newspapers in relation to somewhat sensational events and criminal proceedings thought to be of general interest. They purport to report the charges against respondent and events as they took place in that connection, in court and out. With one possible exception, no positive opinion was offered as to the guilt or innocence of the respondent. On the whole, they are of that class of publications usually appearing in the public press when such matters arise and with which all newspaper readers are more or less familiar. [*Id.* at 480.]

[8] In *Irvin v Dowd*, *supra*, the sheer volume of publicity was far in excess of the material defendant Jendrzejewski has provided this Court. In *Irvin*, as in this case, the crimes occurred in a small rural community. The Supreme Court examined the data and noted that a roving reporter

and state cases in which the right to a fair trial has been of concern. For example, in *People v DeLisle*, 202 Mich App 658, 668; 509 NW2d 885 (1993), there were in excess of one hundred newspaper articles published over a period of ten months. In *People v Tyburski*, 445 Mich 606, 646; 518 NW2d 441 (1994), the scope of publicity was extensive, encompassing not only local, but national and international newspapers and magazines.[9] Additionally, significant radio and television coverage occurred in both cases.

As the Supreme Court observed in *Murphy, supra* at 800, n 4, "we . . . distinguish between . . . largely factual publicity from that which is invidious or inflammatory." The news accounts in the present case were not inflammatory. In both tone and content, *The Ironwood Daily Globe* coverage was basically factual reporting of news events, including court proceedings. There is no suggestion of appeal to a "lynch mob" mentality.

---

solicited opinions regarding the defendant's guilt from members of the community and broadcast the results over local stations; that the defendant had submitted forty-six exhibits showing a barrage of newspaper headlines, articles, cartoons, and pictures published six to seven months before the trial in newspapers regularly delivered to ninety-five percent of the county residents; and further documentation showed that local radio and television carried extensive newscasts scrutinizing the defendant and the crime committed. *Id.* at 725.

Compared to the limited number of articles published in *The Ironwood Daily Globe*, the effect was not as substantial. *The Ironwood Daily Globe* had a circulation in 1992 of approximately 8,161. (1993 Michigan Newspaper Directory, p 71.) The paper did not reach as high a percentage of Gogebic County's population as did the paper in *Irvin*. The circulation amounted to approximately forty-five percent of the county's 18,000 residents.

[9] There were articles in *The Detroit Free Press*, *The Detroit News*, *The Plymouth Observer*, *The Free Press Sunday Magazine*, *The New York Times*, *USA Today*, *The National Enquirer*, and two British tabloids. *Tyburski, supra* at 646-647.

The initial article on November 23, 1992, stated in a nonsensational manner that a double homicide occurred and that a suspect had been arrested. Subsequent articles were equally factual in nature. For example, in the December 3, 1992, edition, which was the longest article of the series, *The Globe* reported on the preliminary examination, accurately and objectively presented evidence on both sides, and stated that circumstantial evidence was the basis of the prosecutor's charge against the defendant.[10]

The only article that conceivably could have had the effect of informing potential jurors of inadmissible evidence was the factual report of the hearing

---

[10] It reported testimony to the effect that the victims were shot with a .44 magnum, but that the police did not know if the bullets were from a handgun or long gun; defendant had purchased a .44 magnum rifle and a cloth gunsock on November 12, 1992, the gunsock was found in the defendant's truck, but no weapon had been recovered; plaster casting of footprints at the scene of the crime were compared to defendant's boots, and, although the castings were of similar size and pattern, the castings appeared to be size 9 or 9½ compared to defendant's boots, which were a size 10, and the castings did not show an indented pattern found on defendant's boots. Further, on the morning of the murders, the victim's downstairs neighbor heard a person go quietly upstairs, heard two sounds like boards cracking, and then heard someone go downstairs quietly. The neighbor first testified that, after hearing the noises, she saw defendant get into his truck and leave about 4:00 A.M., but later tempered her testimony by saying that she thought it was the defendant she saw under the street light and in her mind she was sure it was him.

The newspaper also recounted testimony that the defendant and victim Bette Vernetti had been in a relationship for about five years, but that it had lately been strained, although defendant stayed with Bette at her apartment on occasion. Also discussed was the existence of a tape given to police by the defendant's father. The defendant asked his father to play it after he was gone explaining that "[e]verything that happened will be on it." No details of the tape's contents were revealed. Although one or two later articles discussed some minor facts concerning the seizure of other physical evidence and repeated a few rambling excerpts from the defendant's so-called "suicide tape" (*The Ironwood Daily Globe*, Saturday, June 5, 1993), the remaining articles were relatively short with brief announcements regarding various motions, trial dates, scheduling, and jury selection.

held on the defendant's motion seeking circuit court Judge Gotham's disqualification. On March 1, 1993, *The Ironwood Daily Globe* reported the allegation made in the motion filed by defense counsel that, during his sentencing of the defendant for a previous crime, the judge stated that he believed the defendant was a "dangerous human being." This was one of only two newspaper references, both in the same month, indicating that the defendant had been involved in an earlier assaultive incident and that Judge Gotham had an opinion regarding his propensity for violence. However, it is not disputed that only one potential juror, Mr. Blooming, had been able to recall with any specificity the newspaper article and the reason for Judge Gotham's disqualification. Although most potential jurors knew of the disqualification,[11] only the one could remember Judge Gotham's "dangerous person" statement.

In summary, the content of the pretrial publicity in this case does not reflect extensive egregious media reporting of a confession made without the assistance of counsel, *Rideau v Louisiana*, 373 US 723, 727; 83 S Ct 1417; 10 L Ed 2d 663 (1963),[12] a barrage of inflammatory publicity leading to a "pattern of deep

---

[11] In fact, Judge Hood introduced himself to the first jury panel by announcing, "I'm sitting on this case by assignment of the Supreme Court in view of Judge Gotham's disqualification."

[12] In *Rideau*, the defendant's conviction was reversed because his confession was televised three times about two weeks before the arraignment to audiences of twenty-four thousand, fifty-three thousand, and twenty-nine thousand people in a parish with a population of about 150,000. There was no evidence that the defendant's confession was procured through violence or psychological pressure; however, Rideau was "interviewed" by the sheriff without the assistance of counsel. *Id.* at 724-727.

The United States Court of Appeals for the First Circuit noted that the Supreme Court had reversed a conviction "based solely on the egregiousness of pretrial publicity and without specific proof that the jurors who

and bitter prejudice" against the defendant, *Irvin*, *supra* at 727,[13] or a carnival-like atmosphere surrounding the proceedings.[14] Nor was there the kind of

---

sat—or the trial itself—were prejudiced thereby." *United States v Morales*, 815 F2d 725, 735 (CA 1, 1987).

[13] In *Irvin*, the press enumerated details of the defendant's previous crimes, accused him of parole violation, claimed he was identified in a police line-up, announced his confession to six murders and twenty-four burglaries, related that Dowd's appointed counsel had been criticized for taking the case and threatened with disbarment if he refused, stated that the prosecutor and other law enforcement officers were determined to secure the death penalty, and reported on local stations solicited public opinion of Dowd's probable guilt and the punishment he deserved. *Id.* at 725-726.

[14] In *Estes v Texas*, 381 US 532, 550-551; 85 S Ct 1628; 14 L Ed 2d 543 (1965), the Supreme Court presumed prejudice and reversed the defendant's conviction where two pretrial hearings were carried on radio and television. The Court stated:

> [Each] hearing was televised live and repeated on tape in the same evening, reaching approximately 100,000 viewers. In addition, the courtroom was a mass of wires, television cameras, microphones and photographers. The petitioner, the panel of prospective jurors, who were sworn the second day, the witnesses and the lawyers were all exposed to this untoward situation. The judge decided that the trial proceedings would be telecast. He announced no restrictions at the time. This emphasized the notorious nature of the coming trial, increased the intensity of the publicity on the petitioner and together with the subsequent televising of the trial beginning 30 days later inherently prevented a sober search for the truth.

In *Sheppard v Maxwell*, 384 US 333, 356-358; 86 S Ct 1507; 16 L Ed 2d 600 (1966), the defendant's conviction was reversed where the news media's manner of reporting inflamed and prejudiced the public.

> Much of the material printed or broadcast during the trial was never heard from the witness stand, such as the charges that Sheppard had purposely impeded the murder investigation and must be guilty since he had hired a prominent criminal lawyer; that Sheppard was a perjurer; that he had sexual relations with numerous women; that his slain wife had characterized him as a "Jekyll-Hyde"; that he was "a bare-faced liar" because of his testimony as to police treatment; and finally, that a woman convict claimed Sheppard to be the father of her illegitimate child. As the trial progressed, the newspapers summarized and interpreted the evidence, devoting particular attention to the material that incrimi-

highly inflammatory attention to sensational details that occurred in *DeLisle* and *Tyburski*. In *DeLisle*, numerous newspaper articles discussed the defendant's murder charge, a confession later determined to be inadmissible at trial, and detailed accounts of his planned escape from a watery death after he deliberately drove his car into the Detroit River, drowning his four children and almost killing his wife. *Id.* at 661, 668. In *Tyburski*, the newspaper articles detailed how the defendant killed his wife and stuffed her in the basement freezer after learning she was having an affair with her daughter's boyfriend, how he passed a lie detector test, all the while knowing her body was in the house, and how he lied to his daughter concerning his wife's whereabouts for over three years. One article described Tyburski's violent temper and compared him to Adolf Hitler. *Id.* at 626, n 10.

---

nated Sheppard, and often drew unwarranted inferences from testimony. At one point, a front-page picture of Mrs. Sheppard's blood-stained pillow was published after being "doctored" to show more clearly an alleged imprint of a surgical instrument.

Nor is there doubt that this deluge of publicity reached at least some of the jury. On the only occasion that the jury was queried, two jurors admitted in open court to hearing the highly inflammatory charge that a prison inmate claimed Sheppard as the father of her illegitimate child. Despite the extent and nature of the publicity to which the jury was exposed during trial, the judge refused defense counsel's other requests that the jurors be asked whether they had read or heard specific prejudicial comment about the case . . . .

The court's fundamental error is compounded by the holding that it lacked power to control the publicity about the trial. From the very inception of the proceedings the judge announced that neither he nor anyone else could restrict prejudicial news accounts. And he reiterated this view on numerous occasions. . . .

The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.

There is no indication in the present case that the community was inundated with adverse pretrial publicity of like magnitude.

## IV. THE VOIR DIRE

Although the Court of Appeals did not consider the relationship between pretrial publicity and the obligation to provide a meaningful basis for the exercise of challenges, we have recently emphasized that, where there is extensive pretrial publicity, jurors should be adequately questioned so that challenges for cause and peremptory challenges can be intelligently exercised. *People v Tyburski, supra* at 619. While declining to rule as a matter of law that sequestered voir dire must be conducted, we held that where the trial court itself conducted the voir dire, a sufficiently probing method must be employed to elicit information concerning exposure to publicity. To avoid the danger of prejudice from pretrial publicity, we suggested three possible approaches: 1) questionnaires prepared by the parties and approved by the court, 2) participation of attorneys in the voir dire, and 3) sequestered questioning of each potential juror. We indicated that there were positives and negatives to each method and did not find one superior to the other.

In the present case, the trial court did not exclude the attorneys from voir dire questioning, and individual sequestered voir dire was conducted by both attorneys. Defendant Jendrzejewski was afforded ample opportunity to develop during voir dire a sufficient factual basis for challenging a juror's impartiality. The judge eliminated jurors who were related to or knew the defendant and his family, the victims and

their families, or either of the attorneys. Any juror who was closely related to a witness was also excused for cause, as well as anyone acquainted with a witness for either side who indicated they could not be objective in determining a witness' credibility. Following this initial inquiry, each remaining prospective juror was individually sequestered and questioned by the prosecutor and defense. No limitations of time or content were placed on the questioning.[15] Thus, unlike the situation presented in *Tyburski*, we find no basis to conclude that there was any impediment to discovery of possible bias and prejudice.

[15] The judge allowed the attorneys to conduct probing individual voir dire in chambers away from the other jurors. Typical of some of the questions asked each juror are the following:

"[H]ave you read or heard about this case?" "Do you get *The Ironwood Daily Globe*?" "There has been a great number of articles, would you agree with that, a large number of articles?" "Do you remember anything specifically about what you read . . . ?" "[H]ow about discussions that you've had about the circumstances of this case . . . [w]hat have you heard?" "Did anyone inform you or discuss anything about any suspects?" "Do you recall indications to you about whether or not [defendant] was guilty or innocent?" "Did you get the impression from the initial articles that this was a cut and dried case?" "[D]o you have an opinion as to whether [defendant] is guilty?"

The defense attorney also questioned the jurors regarding the defendant's motion to disqualify Judge Gotham, which the jurors knew had been granted. Counsel was seeking to determine whether there was pretrial exposure to the reasons why Judge Gotham was not conducting the trial, reasons conducted in open court and reported in the local paper regarding the past criminal conduct of the defendant. Questions such as, "Do you recall anything about Judge Gotham being on the case, off the case or anything about Judge Gotham?" "Do you recall reading an article about Judge Gotham disqualifying himself?" "Do you know anything specifically about Judge Gotham disqualifying himself?" "[D]o you know the reasons why?" "[A]s you would have read about Judge Gotham's disqualifying himself, did you get any impressions from that information?"

Because these questions were asked of each sequestered potential juror, the concerns we addressed regarding possible taint of the entire panel are not at issue. *Tyburski, supra* at 627.

V. STATISTICAL ANALYSIS INDICATING AN UNFAIR JURY

"As an indirect means of determining whether community prejudice resulting from publicity may have unconsciously infected the jurors who were seated, the Court has sometimes noted how many non-seated members of the venire admitted to a disqualifying prejudice." *United States v Morales*, 815 F2d 725, 734 (CA 1, 1987). In *Morales*, a case in which "[v]irtually all members of the venire admitted to some prior knowledge" of the incident and investigation, the court found that the veniremen who admitted to having an opinion regarding the guilt or innocence of the defendant amounted to about twenty-five percent of the array. *Id.* at 735. The court observed that in *Murphy, supra,* the Supreme Court had affirmed the conviction, finding that the fact that twenty-five percent of the venire had been excused did not suggest a " 'community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.' " *Id.,* citing *Murphy, supra* at 803. The *Morales* court concluded that the twenty-five percent of the venire admitting an opinion regarding the defendant's guilt did not reflect a community so inflamed by pretrial publicity that it would overcome jurors' assertions of impartiality. *Id.*

In analyzing this claim, we first observe that the Court of Appeals erroneously concluded that because "seventy percent of the potential jurors were excused for cause," the seated jurors' protestations that they lacked knowledge about the case or that they could set aside an opinion were unreliable. Our independent review of the proceedings does not substantiate the assumption that seventy percent of the array were excused because they admitted prejudice against the

defendant. Array members were excused because of their relationship to trial participants, because they had been a victim of a crime, because they admitted to having closely followed the case, for reasons of health, for personal and employment reasons, for family-related concerns, and for a stated inability to follow instructions of law.

Three panels were called over a four-day period. The first panel consisted of forty-nine potential jurors. A total of thirty-four were excused for cause; of these, twenty-four were excused after general voir dire as follows: two for family reasons, four for employment-related difficulties, two for possible attorney-client conflict, seven who knew or were related to the parties or witnesses, five who had medical problems, one who could not follow instructions of law, and three who had formed an opinion either for or against the defendant. From the remaining members of the first panel, five jurors were seated, ten were excused peremptorily, and ten potential jurors were excused after individual voir dire, one for family reasons, one for medical problems, and one because she knew the families of the defendant, the male victim, and a number of the witnesses. Four were excused for cause because the judge or the attorneys had concerns regarding their impartiality despite their assertions to the contrary, and three had formed an opinion either for or against defendant. Thus, six out of forty-nine, or approximately twelve percent of the first panel, had actually formed and retained an opinion.[16]

---

[16] The people's brief and appendix suggest, in our view incorrectly, that ten out of a total of forty-nine on the first panel were excused for bias,

The second panel consisted of forty-one potential jurors. A total of thirty-four were excused for cause; twenty-five were excused after general voir dire as follows: one could not follow instructions of law, three had possible attorney-client conflict, fifteen knew or were related to the parties or witnesses, one for personal reasons, one had overheard discussions between some of the trial witnesses and had memory problems, and four had formed an opinion either for or against the defendant. From the remaining members of the second panel, three jurors were seated, four were excused peremptorily, three were excused for cause after individual voir dire because the judge or attorneys had concerns regarding their impartiality despite their assertions to the contrary, and six were excused because they had formed an opinion either for or against the defendant. Ten out of a total of forty-one potential jurors, or approximately twenty-four percent of the second panel had actually formed and retained an opinion.[17]

The third panel consisted of thirty-six persons, three from the previous day and thirty-three new members. Out of the thirty-three new members, five were never called. A total of twenty were excused for cause; eighteen were excused after general voir dire as follows: one for medical problems, two for family reasons, one for personal reasons, two for possible attorney-client conflict, one who could not follow instructions of law, nine who knew or were related to

real or perceived. If this higher number is accepted, the percentage increases to approximately twenty percent.

[17] The plaintiff's appendix suggests that fourteen out of a total of forty-one persons on the second panel were excused for bias, real or perceived, or approximately thirty-four percent of the second panel.

the parties or witnesses, and two who had formed an opinion either for or against the defendant. From the remaining members of the third panel, six jurors were seated, two were peremptorily excused, and two potential jurors were excused because the judge or the attorneys had concerns regarding their impartiality despite their assertions to the contrary. Two out of the thirty-three potential jurors, or approximately six percent of the third panel, had actually formed and retained an opinion.[18]

Thus, our independent examination of the voir dire indicates that out of 119 potential jurors, eighteen persons, or fifteen percent of the jury pool, indicated that they had formed and retained an opinion regarding the defendant. Even assuming arguendo the higher number conceded by the people, twenty-eight persons were excused for lack of impartiality or approximately twenty-five percent of the entire jury pool. We find no case in which any court in the country has assumed from such a statistic that the jurors seated, all of whom disclaimed partiality, were presumptively prejudiced against the defendant. As in *Morales* and *Murphy, supra,* we decline to find that community sentiment impeached the indifference of jurors who displayed no animus of their own.[19]

---

[18] The plaintiff's appendix suggests that four out of the thirty-three persons on the third panel were excused for bias, real or perceived, or approximately twelve percent of the third panel.

[19] By our count, the defendant did not exhaust his peremptory challenges, exercising only eleven. However, the defense attorney stated for the record that he was out of peremptory challenges and requested that the judge grant him additional peremptory challenges. Neither the judge nor the prosecuting attorney disputed this assertion. The judge determined that the request was discretionary and denied the motion. The defense attorney again renewed his motion for change of venue noting his dissatisfaction with the jury panel. The general rule is that the defendant

Finally, we note that the suggestion by the Court of Appeals that the defendant was deprived of a fair trial because two jurors actually were seated who had formed an earlier opinion is also incorrect.[20] The judge denied challenges for cause for two of the fourteen jurors seated and one of those was subsequently

---

must exhaust his peremptory challenges to preserve a jury selection question. In this situation, *People v Tyburski*, 196 Mich App 576, 583, n 5; 494 NW2d 20 (1992), the Court of Appeals explained:

> We note that defendant did not exhaust his peremptory challenges. Generally, to preserve for appeal a question of jury selection, a party must exhaust its peremptory challenges. *People v Taylor*, 195 Mich App 57; 489 NW2d 99 (1992). However, when a party refuses to express satisfaction with the jury empaneled, the issue is preserved for appeal. *Id.* at 60. ("Requiring defendant to unintelligently exercise them [peremptory challenges] would be pointless, because it could not have prevented the error, eliminated its prejudice, or further demonstrated the error and its prejudice.") Defendant's attorney preserved this issue for appeal by clearly stating her objections and dissatisfaction with the jury panel . . . .

[20] We also note that the dissent implies bias from the fact that seated juror Dianich worked in the same plant as the female victim's father. Dianich specifically stated that he had not discussed the case with the victim's father, although he had overheard some general comments made by the victim's father, about the defendant. This juror stated that, although he had heard others say that defendant might be guilty, his opinion was that "looking at a person you can't—to me, you can't say he's guilty or innocent. You've got to be presented with facts and everything." Dianich also noted that other people's opinions were "mostly just smoke" and did not affect him. Because it had "been so long" ago, he stated that he had very little recall of the newspaper or media broadcasts and that they had not made an impression on him with respect to the defendant's guilt or innocence.

The dissent further implies bias from the fact that Juror Ossanna had listened to his scanner on the day that police were looking for the defendant. The transcript indicates that all he knew was that "a suspect was picked up." Ossanna stated that he stopped reading anything that had to do with the case when he got his letter for jury duty so that he "wouldn't be prejudiced by what [he] read in the paper" and that any information he may have heard he had "washed it out of [his] mind." Ossanna asserted that he did not have an opinion about the guilt or innocence of the defendant and that he did not have any bias that the defendant was somehow guilty.

dismissed by draw. The individual voir dire indicates that both challenged jurors were adamant that any previous opinion that they might have had was completely set aside and that they could definitely be fair and impartial.[21]

### VI. SUMMARY AND CONCLUSION

Early on, this Court assessed the capacity of the media to sway public opinion and thus potential jurors in highly publicized cases.

> "Newspaper reports are ordinarily regarded as too unreliable to influence a fair-minded man when called upon to pass upon the merits of a case in the light of evidence given under oath; and it is now a well-settled rule that a juror, although he may have formed an opinion from reading such reports, is competent if he states that he is without prejudice and can try the case impartially according to the evidence, and the court is satisfied that he will do so." [*Swift, supra* at 480-481.]

---

[21] Juror G. Kleimola was challenged for cause. He stated that he did not know anyone involved, did not follow the case in the newspaper, and did not know anything about Judge Gotham. At one point he thought the authorities might have had the right person in custody, but did not think this was "a petty [sic] cut and dried case" and had no present opinion regarding defendant's guilt because all prior traces had been "washed away."

Juror K. Johnson was challenged for cause. She stated that she was not from the immediate locality and was not related to anyone involved with the trial. This juror also initially thought the authorities might have had the right person in custody and was leaning toward the defendant as being guilty, but said that this was a viewpoint from "so long ago." She noted that you must have "proof of evidence" and that although there was a lot of "media hype," there was no real evidence. When asked if she were the defendant would she want a person like herself sitting on the jury she answered, "yes." She thought she could come to the panel "with an open mind" and sit "fairly and impartially." She said she could "set aside" her previous opinion and indicated that she was properly cognizant of the seriousness of the duty imposed on jurors.

Consideration of the quality and quantum of pretrial publicity, standing alone, is not sufficient to require a change of venue. The reviewing court must also closely examine the entire voir dire to determine if an impartial jury was impaneled. *People v Prast (On Rehearing)*, 114 Mich App 469, 479; 319 NW2d 627 (1982). In *Patton v Yount*, 467 US 1025; 104 S Ct 2885; 81 L Ed 2d 847 (1984), the Supreme Court suggested that a proper review includes independent examination of the nature of the publicity surrounding the trial, voir dire testimony of the venire as a whole, and the individual voir dire testimony of the jurors eventually seated. In this state, as in the United States Supreme Court, the general rule holds that if a potential juror, under oath, can lay aside preexisting knowledge and opinions about the case, neither will be a ground for reversal of a denial of a motion for a change of venue. *DeLisle, supra* at 662.

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [*Irvin, supra* at 723.]

To the extent that it is the reliability of the protestation that the jurors actually seated "lack knowledge about the case" that is drawn into question by a statistical approach, the Court of Appeals conclusion necessarily assumes that a fair juror is one who lacks knowledge about a case, a statement that is both legally and logically incorrect. It is the policy of this state that prior impressions or opinions, not positive

in character, do not mandate disqualification.[22] Moreover, as the Supreme Court has stated in rejecting this claim on constitutional grounds:

Petitioner also relies on the Standards for Criminal Justice 8-3.5 (2d ed 1980) promulgated by the American Bar Association. These Standards require interrogation of each juror individually with respect to "what the prospective juror has read and heard about the case," "[i]f there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material." These Standards, of course, leave to the trial court the initial determination of whether there is such a substantial possibility. But, more importantly, the Standards relating to voir dire are based on a substantive rule that renders a potential juror subject to challenge for cause, without regard to his state of mind, if he has been exposed to and remembers "highly significant information" or "other incriminating matters that may be inadmissible in evidence." That is a stricter standard of juror eligibility than that which we have held the Constitution to require. Under the ABA Standard, answers to questions about content, without more, could disqualify the juror from sitting. Under

---

[22] This determination is controlled by statute. MCL 768.10; MSA 28.1033 provides:

The previous formation or expression of opinion or impression, not positive in its character, in reference to the circumstances upon which any criminal prosecution is based, or in reference to the guilt or innocence of the prisoner, or a present opinion or impression in reference thereto, such opinion or impression not being positive in its character, or not being based on personal knowledge of the facts in the case, shall not be a sufficient ground of challenge for principal cause, to any person who is otherwise legally qualified to serve as a juror upon the trial of such action: Provided, That the person proposed as a juror, who may have formed or expressed, or has such opinion or impression as aforesaid, shall declare on oath, that he verily believes that he can render an impartial verdict according to the evidence submitted to the jury on such trial: Provided further, That the court shall be satisfied that the person so proposed as a juror does not entertain such a present opinion as would influence his verdict as a juror.

the constitutional standard, on the other hand, "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton* [*supra* at 1035]. Under this constitutional standard, answers to questions about content alone, which reveal that a juror remembered facts about the case, would not be sufficient to disqualify a juror. "It is not required . . . that the jurors be totally ignorant of the facts and issues involved." [*Irvin*, 366 US 722.]

The ABA Standards, as indicated in our previous discussion of state and federal court decisions, have not commended themselves to a majority of the courts that have considered the question. The fact that a particular rule may be thought to be the "better" view does not mean that it is incorporated into the Fourteenth Amendment. *Cupp v Naughten*, 414 US 141; 94 S Ct 396; 38 L Ed 2d 368 (1973). [*Mu'Min v Virginia, supra* at 430-431.]

Thus, as the Supreme Court has made clear, the value protected by the Fourteenth Amendment is lack of partiality, not an empty mind. While the question of standards for selecting a fair and impartial jury in the context of the global village of the information age is not presented here, juror ignorance can no more be the denominator of the equation for impartiality in the global village than it was when the village was the vicinage.

The approach endorsed by the Court of Appeals would discourage, rather than encourage the selection of a jury as free as possible from extraneous taint from all sources. To suggest that by granting liberal use of challenges for cause a trial judge is creating a basis to challenge the verdict of a seated jury on the ground that it is not impartial would have the inevitable effect of curtailing the use of challenges for cause to only those that are clearly legally mandated.

Similarly, the dissent's position calls into question the history and established precedence of the jurisprudence encompassing change of venue in this state. For many years, Michigan was sparsely populated and composed largely of small town communities. A sizeable portion of the state, especially the northern part of the lower peninsula and the upper peninsula, still retain this character. The standards of what would constitute possible jury taint from the viewpoint of a highly populated urban area are significantly different and should not be imposed on these communities. The trial judge was familiar with the community and did not abuse his discretion in denying a change of venue in this case because he was able to determine at the end of the jury selection process that he had a fair and unbiased jury panel. The position the dissent advocates would effectively remove all murder trials from the vicinage composed of small town communities located in less densely populated areas of the state.

We hold that "the pretrial publicity was not vicious, excessive, nor officially sponsored, and that the jurors were able to set aside any preconceived notions of guilt," *Patton, supra* at 1028, and that there is insufficient evidence, direct or circumstantial, of a "pattern of deep and bitter prejudice" in the community to impeach the fairness of the seated jury. *Irvin, supra* at 727. Under the totality of the circumstances, the defendant was not denied a fair trial, and there was no abuse of discretion in the trial court's denial of defendant's motion for a change of venue.

The decision of the Court of Appeals is vacated and the defendant's case is remanded for further consideration of defendant's remaining issues on appeal.

MALLETT, C.J., and RILEY and KELLY, JJ., concurred with BOYLE, J.

WEAVER, J., concurred only in the result.

BRICKLEY, J. (*dissenting*). Because I conclude that the trial court abused its discretion in not granting the defendant's change of venue motion, I respectfully dissent.

I

We review the denial of a motion for change of venue under an abuse of discretion standard. See *People v Swift*, 172 Mich 473; 138 NW 662 (1912); *People v DeLisle*, 202 Mich App 658, 662; 509 NW2d 885 (1993). To establish that he was entitled to a change of venue, the defendant must show that there either was a pattern of strong community feeling against him and that the publicity was so extensive and inflammatory that jurors could not remain impartial when exposed to it, *People v Passeno*, 195 Mich App 91, 98; 489 NW2d 152 (1992), or that the jury was actually prejudiced or the atmosphere surrounding the trial created a probability of prejudice.

The right to a jury trial guarantees to an accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *Tumey v Ohio*, 273 US 510; 47 S Ct 437; 71 L Ed 749 (1927). "A fair trial in a fair tribunal is a basic requirement of due process." *Irvin v Dowd*, 366 US 717, 722; 81 S Ct 1639; 6 L Ed 2d 751 (1961), quoting *In re Murchison*, 349 US 133, 136; 75 S Ct 623; 99 L Ed 942 (1955).

This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender, or the station in life that he occupies. *Irvin* at 722. "The theory of the law is that a juror who has formed an opinion cannot be impartial." *Id.*, quoting *Reynolds v United States*, 98 US (8 Otto) 145, 155; 25 L Ed 244 (1878).

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread, and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion regarding the merits of the case. *Irvin, supra* at 722.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict on the basis of the evidence presented in court. *Id.* at 723, citing *Spies v Illinois*, 123 US 131; 8 S Ct 21; 31 L Ed 80 (1887).

"The adoption of such a rule, however, 'cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.'" *Id.* "[W]hether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact . . . ." *Reynolds* at 156.

> The affirmative of the issue is upon the challenger.
> Unless he shows the actual existence of such an opinion in
> the mind of the juror as will raise the presumption of parti-
> ality, the juror need not necessarily be set aside . . . . If a
> positive and decided opinion had been formed, he would
> have been incompetent even though it had not been
> expressed. [*Id.* at 157.]

In *United States v Wood*, 299 US 123, 145-146; 57 S
Ct 177; 81 L Ed 78 (1936), the Court stated:

> Impartiality is not a technical conception. It is a state of
> mind. For the ascertainment of this mental attitude of
> appropriate indifference, the Constitution lays down no par-
> ticular tests and procedure is not chained to any ancient
> and artificial formula.

Our Court of Appeals has held that "[t]he existence
of pretrial publicity does not by itself require a
change of venue." *People v Prast (On Rehearing)*, 114
Mich App 469, 477; 319 NW2d 627 (1982). When a
juror, although having formed an opinion from media
coverage, swears that he is without prejudice and can
try the case impartially according to the evidence,
and the trial court is satisfied that the juror will do
so, the juror is competent to try the case. *People v
Furman*, 158 Mich App 302, 321; 404 NW2d 246
(1987). When citizens have been sworn to tell the
truth, and testify under oath that they can be impar-
tial, the initial presumption is that they are honoring
their oath and are being truthful. *DeLisle, supra* at
663.

A change of venue is not necessary if jurors can set
aside their impressions or opinions and render a ver-
dict on the basis of the evidence presented in court.
*Prast* at 477. However, we have held that a change of
venue should be granted if the defendant demon-

strates that there is a pattern of strong community feeling or bitter prejudice against him, and the publicity is so extensive and inflammatory that jurors could not remain impartial when exposed to it. *Id.*

## II

The defendant here has established that, under the totality of the circumstances, the trial court abused its discretion in not granting the change of venue motion. The members of the venire expressed that everyone in the community had opinions regarding the case and the subject was discussed frequently. Before the start of voir dire, one prospective juror was dismissed for contacting the prosecuting attorney. The juror was attempting to get out of jury duty because she knew just about everyone involved in the case. She stated to the court that, while the prospective jurors were waiting for voir dire to begin, they were discussing different reasons to eliminate jury trials. She also stated that the other prospective jurors stated "the area is a small area, people talk and they read."

There is little doubt that this defendant's trial was affected by not only the media coverage, but by community gossip. Several members of the jury panel stated that they had formed an opinion in the matter after discussing the matter with the victim's family members. As the Court of Appeals stated:

> Of the jurors who were actually seated on the jury, a number had admitted to exposure to the pretrial publicity, with varying opinions being formed. One juror stated that she was frustrated with the number of cases in Gogebic County because it was costing so much money, that she was leaning towards defendant being guilty, but that she could set aside her opinions and what she had read.[1]

Another juror stated that she had read something of the events when the murder occurred, but that she had not formed an opinion. However she did state that it "was a good thing that somebody had been apprehended so they could get to the bottom of it." A third juror, while stating that he had not formed any opinion about the case, admitted that he had spoken about the murders with the father of one of the victims.[1] A fourth juror was the wife of a minister who had counseled a member of one of the victim's family after the murder, but she said that she did not believe that would pose a problem but "one can never know."[2] A fifth juror stated that he had read the pretrial reports, had not formed an opinion, but did state that "there doesn't seem to be any other avenues. I mean it's not like we have three suspects in this case." A sixth juror stated that they had read some articles prior to trial, had been listening to his police scanner on the day the sheriffs were searching for defendant, but that he had not formed an opinion. Another juror stated she had read about the case, that there had been a large number of articles in the paper, but that she had not formed an opinion. The remaining jurors denied any extensive knowledge of the case or having formed an opinion.

---

¹Defendant challenged her for cause, but that challenge was denied.

---

[Unpublished opinion per curiam, issued April 6, 1995 (Docket No. 168041), slip op at 2.]

A seventh juror was related to the district judge who conducted the preliminary examination. An

---

¹ In fact, this juror had worked with the victim's father. At the time of the murder, and sometime thereafter, they worked side by side.

² Moreover, a member of the victim's family taught Sunday school at her husband's church.

eighth juror stated that several members of her family were police officers.

Additionally, the prosecution in this case has conceded that twenty-nine of 119 members of the jury pool indicated they could not remain unbiased. However, thirty-three members were dismissed for a presumed bias because they knew the victims, the defendant, or their families. That means out of the 119 members summoned, sixty-two, or fifty-two percent, were dismissed for actual or presumed prejudice.

When looked at under the totality of the circumstances, I believe that the defendant proved that the venire was prejudiced not only because of the local media reports, but on the basis of the jurors' previous relationship with the decedents or their family members. Despite their best intentions to do so, the jurors would have had a difficult time setting aside preconceived notions of guilt. In this case, the community conversations did not revolve around the defendant's guilt or innocence; they revolved around the defendant's motive and sanity. Consequently, I believe that defendant has shown that his right to an impartial jury was prevented because of the strong community sentiment that he committed the crimes with which he was charged.

III

The majority erroneously holds that the degree of pretrial publicity was not excessive and that its contents were not of a prejudicial nature.

First, I believe that the majority fails to take into account the television and radio reports regarding this case. The lower court file includes an affidavit of

defense counsel noting the numerous television and radio reports of the murders and of the court proceedings.[3] It is evident from the statements of the prospective jurors that they had been exposed to not only the newspaper reports, but the radio and television reports as well.

Second, I believe the majority underestimates the effect of the articles printed in the *Ironwood Globe*. One article was particularly prejudicial. It relates that Judge Gotham had to disqualify himself because he had previously sentenced the defendant in an unrelated incident. The *Ironwood Globe* reported:

> Judge Gotham, in disqualifying himself from the double homicide, noted that Bette Vernetti could have been injured in the 1991 incident. Jendrzejewski assaulted a male companion of Vernetti's at that time, according to court officials.
>
> Judge Gotham said, in reference to the Dec. 5, 1991 sentencing, "I said he was a dangerous human being. The sentencing guidelines were inadequate." He indicated the guidelines did not recommend enough jailtime for this crime. "He wasn't kept in jail long enough. Jendrzejewski got out of jail and he is now charged with the Nov. 22 murders." [*Ironwood Globe*, March 1, 1993, pp 1-2.]

The majority states that only one juror remembered the article specifically at the time of voir dire. However, most jurors did know that the judge had disqualified himself. I believe that this type of statement is one that could leave a preconceived notion regarding

---

[3] Defense counsel submitted an affidavit because he was unable to obtain transcripts of the television and radio reports. The affidavit states that "WLUC Television, Marquette, Michigan has broadcast at least three separate news accounts, including in court video tape," and that the three radio stations in Gogebic County—WUPM, WIMI, and WJMS—all broadcast similar news accounts.

guilt in the mind of a juror even though the juror may not remember the specific wording of the article.

Additionally, several other articles conveyed the fact that the defendant's attorney was court appointed and the state was challenging whether Jendrzejewski was actually indigent. The fact that the jurors knew that they were trying a man with court-appointed counsel may have affected their judgment because many of the jurors expressed their disdain over the costs of jury trials. In fact, one member of the actual panel stated that it was frustrating because "it's costing so blasted much money."

Further, the articles mentioned several pieces of evidence, including portions of an answering machine tape found by the police at Ms. Vernetti's home.

The record shows that the trial judge and the prosecutor recognized that the potential jurors had been influenced by the local media. The trial judge stated near the end of the first day of voir dire:

> I am becoming more and more concerned that the folks that we have out there, that are coming as prospective jurors, have been blitzed by the local media insofar as this case is concerned.

The prosecutor admitted that he was unsure that they could seat an impartial jury:

> Judge, the State is growing increasingly concerned as to what's going to happen down the road. This was one sample. Perhaps we could—I don't know, perhaps we could initially begin by bringing in a juror at a time and determining whether or not in twenty minutes or a half an hour we are spinning our wheels.

Further, he stated:

So far two out of the four that we've questioned have left me with a distinct impression that they have been strongly influenced by the media. I am as well quite concerned about that.

I guess though that if I had my choice in the matter I would prefer to, at the very least exhaust the one panel. And if we are at a pace that has not picked up beyond that at which we currently find ourselves, then maybe we should revisit the motion for change of venue with some serious consideration.[4]

However, the majority ignores the statements of the judge and prosecutor when it states:

The Court of Appeals asserted that "[i]t is undisputed that there was an enormous amount of pretrial publicity concerning this case . . . ." Unpublished opinion per curiam, issued April 6, 1995 (Docket No. 168041), slip op at 1. We disagree. Our independent review of the pretrial publicity does not lead to the conclusion that it was either extensive or prejudicial. [*Ante* at 502.]

My review of this case leads me to believe that there was not only extensive, prejudicial pretrial publicity through the media, but that there was also extensive and prejudicial pretrial gossip. The majority fails to recognize the effect that the oldest form of communication—the grapevine—can have on a jury. There were numerous comments from the prospective jurors that the murders and the defendant's trial were subject to extensive gossip and rumors. Further,

---

[4] One of the reasons that the prosecutor and judge alluded to for denying a change of venue was the Fourth of July holiday. Apparently, the town of Bessemer has a large Fourth of July celebration. The prosecutor stated that it would be inconvenient for the police officers who were witnesses in the trial to be in another county because they would have to testify during the festival. His hope was to try the case as soon as possible so that it could end before the holiday.

the majority ignores the fact that members of the jury pool and at least one actual juror listened to the police scanner while the police were looking for the defendant in order to question him.

Therefore, while a change of venue is not necessary if jurors can set aside their impressions or opinions and render a verdict on the basis of the evidence presented in court, this defendant has demonstrated the existence of strong prejudicial community feelings, based on extensive publicity, community supposition, and rumors so pervasive and inflammatory that jurors could not expect to remain impartial when exposed to it. Therefore, a change of venue should have been granted.

I would affirm the decision of the Court of Appeals.

CAVANAGH, J., concurred with BRICKLEY, J.