*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JON SCOTT STYGLER,

        Defendant-Appellant.

UNPUBLISHED
October 08, 2024
12:09 PM

No. 360400
Chippewa Circuit Court
LC No. 19-003809-FC

Before: BOONSTRA, P.J., and JANSEN and N. P. HOOD, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of one count of first-degree home invasion, MCL 750.110a(2), five counts of unlawful imprisonment, MCL 750.349b, one count of kidnapping, MCL 750.349, and one count of armed robbery, MCL 750.529. The trial court sentenced defendant to concurrent prison terms of 225 months to 30 years for the armed robbery conviction, as well as for the kidnapping conviction, and 86 months to 15 years for each unlawful imprisonment conviction. The trial court also sentenced defendant to a prison term of 95 months to 20 years for the home invasion conviction, to be served consecutively to his other sentences. We affirm defendant's convictions, vacate the sentences and remand for resentencing.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In 2019, defendant assisted his friend, George Cunningham, in kidnapping Cunningham's biological son, ZC, from his foster family, the Quinns. Maria Quinn is Cunningham's sister; she and her husband Paul have three children, MAQ, LQ and MQ, who lived with them in 2019. MAQ was eighteen years old at the time of the incident, LQ was sixteen, and MQ was fifteen. On March 13, 2019, the Quinns were eating dinner when Cunningham and defendant arrived in Cunningham's truck. The Quinns were expecting Cunningham; Maria had planned to drive into town with Cunningham and ZC to contact ZC's biological mother in the Philippines. When Maria exited the home with ZC, Cunningham cornered her and bound her hands and feet with zipties while defendant put tape over her mouth. The two men put Maria in the backseat of the Quinn family car.

-1-

Cunningham and defendant then entered the home with ZC and confronted Paul and the other children in the kitchen. Paul testified that Cunningham and defendant stated that they were going to take ZC. Cunningham was holding a can of wasp spray, and defendant has holding a large stick or club. A fight broke out; defendant began wrestling with Paul, while LQ and MQ began punching Cunningham. In response, Cunningham sprayed them with wasp spray, which had no apparent ill effects. MQ stabbed both Cunningham and defendant with a boxcutter. At some point, Paul realized that he and his sons were not going to win the fight, and he told his sons to stop fighting. Paul and his sons sat down and defendant and Cunningham ziptied their legs and arms. Defendant cut the zipties binding LQ's arms because they had been applied too tightly; MQ testified that defendant tried to cut them with a pocket knife but could not, ultimately resorting to a pair of scissors he found in the house.

ZC and MAQ had both fled the room during the fight. Defendant stayed in the kitchen with Paul, LQ and MQ while Cunningham searched the house. Cunningham discovered MAQ in her room, tied her arms and legs, and kicked her while asking where ZC was; MAQ did not know. Cunningham eventually located ZC and carried him out of the house. Cunningham took Paul and Maria's cellphones and threw them into a snowbank outside the house; defendant, Cunningham, and ZC then left in Cunningham's truck. MAQ still had a phone, and she used it to call 911. The two men drove to a property near Whitefish Bay, where they used two snowmobiles to pull a sled carrying ZC in an attempt to cross the frozen Lake Superior into Canada. Police eventually apprehended defendant and Cunningham approximately two miles offshore.

Defendant and Cunningham were tried as co-defendants. Before trial, the trial court and the parties' attorneys conducted an extensive voir dire. Due to the significant publicity that had surrounded the case, many of the questions to prospective jurors involved whether they had prior knowledge of the events of March 13, 2019. On the second day of voir dire, after counsel for the prosecution asked a prospective juror what she had heard about the case, the trial court instructed the attorneys to refrain from asking questions that could taint the jury pool, stating in relevant part:

> THE COURT: Maybe we can stop and refrain from asking those questions because there are gonna be answers here that are just gonna taint the . . . whole [jury] pool here and I don't want to do that.

> *  *  *

> THE COURT: I mean you can't control . . . however they respond, so let's just pare down the—we're getting close to—I mean, you know, it's just general common sense here now and we don't have to ask everybody if they had an AMBER Alert; some people did, some people didn't. But I don't want to get into what they heard because then it taints the whole pool.

> *  *  *

> THE COURT: But that's what I'm saying. Let's not ask that because I don't know what their—you don't know what their response is gonna be. That's what I'm saying. So we're just getting into—assume, for the sake of the argument, everybody in this room's heard the AMBER—AMBER Alert.

\* \* \*

THE COURT: Just assume it and then we don't have a problem because— and then they can—we can present the evidence as we go forward. Just assume everybody in this room has heard the AMBER Alert.

After the jury was selected, defendant orally moved for a change of venue due to pretrial publicity; the trial court denied the motion.

At trial, the prosecution argued that the wasp spray Cunningham had carried and used satisfied the definition of a "dangerous weapon" for the purposes of armed robbery. Paul, LQ and MQ testified that they had not experience any ill effects from contact with the wasp spray. The prosecution introduced the warning label on the can of wasp spray. Detective Mitchell of the Chippewa County Sheriff's Office testified regarding defendant's and Cunningham's arrests and the items found in their possession. When asked by the prosecution about his knowledge of wasp spray, Detective Mitchell opined that it was harmful and could be fatal to humans. Defendant's counsel sought to admit a safety data sheet produced by the wasp spray's manufacturer, but the trial court sustained the prosecution's objection to the sheet's admission.

The jury convicted defendant, and he was sentenced, as described. Defendant subsequently filed a motion in the trial court for a new trial or *Ginther*[1] hearing regarding his trial counsel's ineffectiveness, which the trial court denied. This appeal followed. After filing his claim of appeal, defendant filed two motions with this Court to remand for a new trial or evidentiary hearing; this Court denied both motions without prejudice to this Court determining on plenary review whether remand is necessary.[2]

## II. VOIR DIRE/CHANGE OF VENUE

Defendant argues that the trial court erred by instructing the attorneys to limit their voir dire questioning concerning pretrial publicity, and by denying defendant's motion to change venue. Alternatively, defendant argues that his counsel was ineffective for failing to request individualized, sequestered voir dire of each potential juror, and by failing to request additional preemptory challenges. We disagree.

We review for an abuse of discretion a trial court's decisions regarding the scope and conduct of voir dire. *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). A trial court abuses its discretion if it fails to conduct voir dire in a manner that "allows the court and the parties to discover hidden bias that would render a potential juror incompetent." *Id*. at 619. We also review for an abuse of discretion a trial court's denial of a motion to change venue. *People v Jendrejewski*, 455 Mich 495, 500; 566 NW2d 530 (1997).

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] See *People v Stygler*, unpublished order of the Court of Appeals, entered October 26, 2023 (Docket No. 360400); *People v Stygler*, unpublished order of the Court of Appeals, entered January 31, 2024 (Docket No. 360400).

A claim of ineffective assistance of counsel presents a mixed question of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). We review for clear error the trial court's factual findings, and review de novo its conclusions of law. *Id.* "To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability [exists] that the outcome of the proceeding would have been different but for trial counsel's errors." *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003).

The trial court has discretion over the scope and conduct of voir dire; a defendant does not have the right to have voir dire conducted by counsel or the right to "content-based publicity questions in every high publicity case." *Tyburski*, 445 Mich at 618. However, "[i]t is imperative, in securing the rights of the parties to an impartial jury, for the court to allow the elicitation of enough information so that the court itself can make an independent determination of a juror's ability to be impartial." *Id.* at 620. Trial courts should "guard against potential bias resulting from media exposure" in conducting voir dire. *Id.* at 623. While the trial court has "wide discretion in the *manner* they employ to achieve the goal of an impartial jury," the court does not "have discretion to simply fail to elicit enough information during voir dire to make an intelligent assessment of bias." *Id.* at 623.

As defendant points out, there was substantial publicity surrounding this case. Accordingly, a significant portion of the extensive voir dire process was devoted to questioning potential jurors regarding their previous media exposure. It was not until the second day of voir dire that the trial court imposed any limitation on the attorneys' questions to the venire. Even then, in context, the trial court's statements that attorneys should refrain from asking certain questions and "assume everybody in this room has heard the AMBER Alert" were aimed at avoiding eliciting answers from prospective jurors that could taint the whole jury pool, specifically by describing in detail what exactly they had heard about the case from the media or social media. Contrary to defendant's argument, the attorneys were not forbidden from inquiring into the potential jurors' media exposure or familiarity with the facts of the case—rather, the trial court merely cautioned the attorneys to avoid asking questions which could result in potential jurors essentially repeating hearsay that they had been exposed to regarding the case. Even after the trial court's caution, the attorneys for both defendants and the prosecution continued to ask potential jurors if they had been exposed to media or were otherwise familiar with the facts of the case, including whether potential jurors had heard the AMBER Alert, without further objection or admonishment from the trial court. Considering the entire voir dire process, the trial court's caution to the attorneys not to elicit information that could cause bias did not result in the failure to elicit enough information to make an intelligent assessment of bias. *Tyburski*, 445 Mich at 623. In other words, "the method of questioning was adequate to expose bias and to avoid taint." *Id.* at 626.

For these same reasons, the trial court did not err by failing to sequester jurors for individual voir dire, or use questionnaires or other methods to reduce the risk of bias. Again, defendant did not have the right to such procedures; further, the trial court took steps to control the risk of tainting the remaining jury pool, unlike the trial court in *Tyburski* that refused "to frame questions so that jurors could indicate whether they held an opinion without expressing what the opinion was." *Tyburski*, 445 Mich at 628. Additionally, the trial court and attorneys did not frame questions "to lead the jurors to the conclusion that they could be impartial" and did not "lecture" potential jurors who "volunteered that they could not be fair because of opinions formed after exposure to negative

publicity" in a way that could be heard by the entire venire. *Id*. at 628. We find no error in the trial court's exercise of its discretion over the voir dire process.

Because the trial court did not abuse its discretion in managing the voir dire, it also did not abuse its discretion by denying defendant's motion for change of venue. *Jendrejewski*, 455 Mich at 500.

> Community prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted, and, much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice. [*Id*.]

In this case, while the record does show that this case received significant media coverage, there was not such "unrelenting prejudicial pretrial publicity [that] the entire community will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue." *Id*. at 501, quoting *Mu'Min v Virginia*, 500 US 415, 442, n 3, 111 S Ct 1899, 1914, n 3, 114 LEd2d 493 (1991).

The record shows that there was media coverage of the event after defendant and Cunningham left with ZC but before they were arrested, including social media posts and radio coverage; additionally, an Amber Alert was issued, and law enforcement communicated over radio frequencies that could be accessed via a police scanner. But "[j]uror exposure to information . . . or newspaper accounts of the crime for which he has been charged does not in itself establish a presumption that a defendant has been deprived of a fair trial." *Id*. at 502. Defendant has not established as a matter of law that the community was "saturated with publicity" such that the entire jury pool could be presumed to be tainted. *Id*. at 505. Moreover, the media accounts to which the potential jurors reported being exposed were described as relatively "factual," rather than inflammatory. *Id*. at 505. Although defendant provided the trial court with examples of inflammatory comments on social media posts made by law enforcement concerning this matter, he has not demonstrated that the existence of some negative social media commentary shows the existence of "extensive egregious media reporting," "a barrage of inflammatory publicity leading to a pattern of deep and bitter prejudice against defendant," or a "carnival-like atmosphere surrounding the proceedings." *Id*. at 506-507 (quotation marks and citations omitted).

Further, while no statistical analysis of the jury pool was conducted, we note that many potential jurors reported not having been exposed to any media about the case, while many more had only vague memories of reading something about the case in the newspaper or hearing it on the radio. Only a few potential jurors self-reported that they had already formed an opinion of defendant based on prior media exposure, and no jurors were seated who had expressed that they had already formed an opinion. We decline to conclude from such a small number of potential jurors that the seated jury was presumptively prejudiced against defendant. See *id*. at 414 (declining to find presumptive prejudice to the defendant when at most twenty-five percent of the potential jury pool had indicated they had formed an opinion regarding the defendant). Under these circumstances, we conclude that the trial court did not abuse its discretion by denying defendant's motion for change of venue.

Because we find no error requiring reversal in the trial court's management of the voir dire, we accordingly do not find that defendant's counsel was ineffective for failing to request the use of additional methods to guard against bias, such as sequestered, individual voir dire or the use of questionnaires. Counsel is not ineffective for failing to raise futile or meritless objections. *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012) (citation omitted). With regard to defendant's claim that his trial counsel should have requested more preemptory challenges, we note that only five potential jurors were questioned after defendant and Cunningham exhausted their preemptory challenges, and none of the jurors seated after defendant exhausted his challenges had expressed a bias against defendant or indicated that they had been exposed to media accounts of the case. Defendant has not established that any failure on the part of his counsel to request additional challenges prejudiced the proceedings against him. *Ackerman*, 257 Mich App at 455.

## III. DANGEROUS WEAPON

Defendant argues that the evidence at trial was insufficient to convict him of armed robbery, or that such a conviction was against the great weight of the evidence, because no reasonable juror could have concluded that he or Cunningham was armed with a dangerous weapon. Alternatively, he argues that his attorney was ineffective for failing to object to the admission of the wasp spray warning label, failing to object to Detective Mitchell's testimony, and failing to properly lay a foundation for the admission of the manufacturer's data sheet for the wasp spray. We disagree.

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). We review the evidence in the light most favorable to the prosecution and draw reasonable inferences from that evidence to determine "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013)(citation omitted). We review for an abuse of discretion a trial court's denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence. *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). We review the evidence in the light most favorable to the prosecution, *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005), to determine whether the evidence preponderates so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand, *Unger*, 278 Mich App at 232, citing *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998). Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial. *Lemmon*, 456 Mich at 643. The hurdle that a court must clear in order to overrule a jury and grant a new trial on the grounds that the verdict was against the great weight of the evidence "is unquestionably among the highest in our law." *People v Plummer*, 229 Mich App 293, 306; 581 NW2d 753 (1998) (quotation marks and citation omitted).

We review for an abuse of discretion a trial court's decision to admit or exclude evidence, but we review de novo the interpretation and application of the Michigan Rules of Evidence. *Ackerman*, 257 Mich App at 442. A claim of ineffective assistance of counsel presents a mixed question of fact and law. *Head*, 323 Mich App at 539. We review for clear error the trial court's factual findings, and review de novo its conclusions of law. *Id.*

To establish that a defendant committed armed robbery, the prosecution must prove beyond a reasonable doubt that:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon." [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007); see also *People v Henry (After Remand)*, 305 Mich App 127, 142; 854 NW2d 114 (2014).]

If a defendant actually possessed a dangerous weapon while his conduct satisfied the other elements of armed robbery, he need not have displayed, brandished, or used the weapon in a threatening manner. See *People v Smith*, 478 Mich 292, 319; 733 NW2d 351 (2007); see also *Henry (After Remand)*, 305 Mich App at 143 (affirming the defendant's armed robbery conviction despite the fact that defendant never threatened to use the scissors he was carrying and the victim did not see the scissors until the defendant was leaving the building after the robbery). A knife may constitute a dangerous weapon. See *People v Reese*, 466 Mich 440, 447; 647 NW2d 498 (2002) (affirming the defendant's armed robbery conviction when he was armed with a knife); see also *People v Banks*, 454 Mich 469, 473; 563 NW2d 200 (1997) (stating that an armed robbery occurs if a robber possesses "an article which is in fact a dangerous weapon—a gun, a knife, bludgeon, etc . . . ."); see also *People v Rutherford*, 140 Mich App 272, 277; 364 NW2d 305 (1985); *People v Croney*, 16 Mich App 293, 294; 167 NW2d 792 (1969). However, not all knives are per se dangerous weapons. *People v Parker*, 288 Mich App 500, 508; 795 NW2d 596 (2010). Whether an object is a dangerous weapon under the circumstances of the case is a question for the factfinder. *People v Norris*, 236 Mich App 411, 415; 600 NW2d 658 (1999). Only one offender in an armed robbery need be armed in order to convict all participants of armed robbery. *People v Turner*, 213 Mich App 558, 572; 540 NW2d 728 (1995).

The record shows that police found two folding knives on defendant's person when he was arrested. Cunningham was found in possession of one folding knife. Witness testimony established that Cunningham possessed and used the wasp spray during the incident at the Quinn home, and that defendant was in possession of at least one knife at that time, which he attempted to use to cut LQ's zipties when they were found to be too tight.

Regarding the knives, defendant notes that not all knives are per se dangerous weapons, pointing out that our Supreme Court has recognized that "there are knives and knives; some dangerous and offensive, and some not." *People v Gogak*, 205 Mich 260, 265; 171 NW 428 (1919) (discussing whether a knife was a dangerous weapon for purposes of the concealed weapon statute). We do not disagree with that statement of the law. But it is for that very reason that the question of whether a particular knife in particular circumstances is a dangerous weapon is properly submitted to the factfinder. *Norris*, 236 Mich App at 415. In this case, the record shows that defendant possessed at least one knife during the home invasion, imprisonment and robbery of the Quinns, and that at least some of the Quinns were aware of that fact and saw defendant use the knife (albeit not in an assaultive manner). As in *Gogak*, the knives in this case were admitted

into evidence and could be examined by the jury. *Gogak*, 205 Mich at 266. Viewing the evidence in the light most favorable to the prosecution, the evidence admitted at trial was sufficient to enable the jury to find that defendant was armed with a dangerous weapon, and the jury's verdict was not against the great weight of the evidence. *Bailey*, 310 Mich App at 713; *Unger*, 278 Mich App at 232.

Because the jury could have reasonably found that defendant possessed a dangerous weapon without considering the wasp spray carried and used by Cunningham, we need not address defendant's arguments concerning whether a reasonable jury could have found that the spray was a dangerous weapon. Relatedly, as defendant's ineffective assistance of counsel claim is based on his trial counsel's allegedly deficient performance in challenging evidence and testimony regarding the wasp spray's dangerousness, defendant cannot demonstrate prejudice. *Ackerman*, 257 Mich App at 455. Therefore, defendant has not established that his trial counsel was ineffective regarding this issue.

## IV. SENTENCING

Defendant argues that he is entitled to resentencing because the trial court relied on improperly-calculated sentencing guidelines and failed to justify the imposition of a consecutive sentence for home invasion. We agree in part, and hold that resentencing is required. We review for an abuse of discretion a trial court's decision to impose a consecutive sentence when authorized to do so. *People v Norfleet*, 317 Mich App 649, 654, 664; 897 NW2d 195 (2016). A trial court abuses its discretion when its decision is outside the range of reasonable and principled outcomes. *Id*. We review for clear error the trial court's factual findings in support of a particular score under the sentencing guidelines, but review de novo as a question of law whether the trial court properly interpreted and applied the sentencing guidelines to its findings of fact. *People v McFarlane*, 325 Mich App 507, 531-532; 926 NW2d 339 (2018).

### A. CONSECUTIVE SENTENCING

Defendant argues that the trial court erred by failing to place on the record particularized reasons for imposing a consecutive sentence for defendant's home invasion conviction. We agree. In Michigan, "concurrent sentencing is the norm, and a consecutive sentence may be imposed only if specifically authorized by statute." *People v Ryan*, 295 Mich App 388, 401; 819 NW2d 55 (2012) (quotation marks and citation omitted). "[T]he imposition of a consecutive sentence is a strong medicine" that should be reserved "for those situations in which so drastic a deviation from the norm is justified." *Norfleet*, 317 Mich App at 665. MCL 750.110a(8) authorizes a trial court to order that a sentence imposed for first-degree home invasion "be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." Because the imposition of a consecutive sentence under MCL 750.110a(8) is a discretionary decision, a trial court is required to set forth on the record the reasons underlying its decisions, so that it may be subject to appellate review. *Norfleet*, 317 Mich App at 664-665. A trial court may not rely on generalities or imprecise terms, but must "give particularized reasons—with reference to the specific offenses and the defendant—to impose" each consecutive sentence. *Id*. at 666. Factors for consideration in determining whether a consecutive sentence was warranted include, but are not limited to:

(1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Walden*, 319 Mich App 344, 352-353; 901 NW2d 142 (2017) (citation omitted).]

In this case, the trial court did not state any particularized reasons on the record for imposing a consecutive sentence; rather, the trial court merely stated that the general goal of the sentences imposed on defendant were punishment, protection of society, and deterrence. These generalities are insufficient to permit this Court to determine whether the trial court appropriately exercised its discretion in ordering a consecutive sentence. *Norfleet*, 317 Mich App at 664-665.

## B. OFFENSE VARIABLES

Defendant also argues that OVs 1, 7, 8, and 10 were incorrectly scored. We agree, with the exception of OV 8.

### 1. OV 1

The trial court assessed 20 points to defendant for OV 1 for subjecting or exposing a victim to a "harmful chemical substance" based on defendant's use of wasp spray. Defendant argues that this variable should have been scored at 5 points, because the wasp spray should have been categorized as a "chemical irritant" rather than a "harmful chemical substance." We agree.

OV 1 concerns the "aggravated use of a weapon," and provides in relevant part:

(1) Offense variable 1 is aggravated use of a weapon. Score offense variable 1 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

* * *

(b) The victim was subjected or exposed to a harmful biological substance, harmful biological device, harmful chemical substance, harmful chemical device, harmful radioactive material, harmful radioactive device, incendiary device, or explosive device . . . . 20 points

* * *

(2) All of the following apply to scoring offense variable 1:

* * *

(b) In multiple offender cases, if 1 offender is assessed points for the presence or use of a weapon, all offenders shall be assessed the same number of points.

* * *

-9-

(d) Score 5 points if an offender used a chemical irritant, chemical irritant device, smoke device, or imitation harmful substance or device. [MCL 777.31.]

A "harmful chemical substance" is "a solid, liquid, or gas that through its chemical or physical properties, alone or in combination with 1 or more other chemical substances, can be used to cause death, injury, or disease in humans, animals, or plants." MCL 750.200h(i); see also *People v Savage*, 327 Mich App 604, 619; 935 NW2d 69 (2019). A "chemical irritant" is "a solid, liquid, or gas that through its chemical or physical properties, alone or in combination with 1 or more other substances, can be used to produce an irritant effect in humans, animals, or plants." MCL 750.200h(a); *Savage*, 327 Mich App at 620. This Court has defined an "irritant effect" as one that "causes inflammation and other evidence of irritation, particularly of the skin, on first contact or exposure, or as a reaction to cumulative contacts, not dependent on a mechanism of sensitization." *Savage*, 327 Mich App at 620. "[T]he key distinction between a 'harmful chemical substance' and a 'chemical irritant' is whether the chemical substance can be used to cause 'death, injury, or disease' in a person or, rather, can be used only to produce 'an irritant effect' in that person." *Id*. A chemical substance can be both an irritant and a harmful substance; if so, the trial court must assess the higher number of points in scoring OV 1. *Id*. at 624. The determination of whether a substance qualifies as a harmful chemical substance or a chemical irritant under OV 1 is distinct from whether the substance qualifies as a "dangerous weapon" under the armed robbery statute. *Id*. at 622.

In this case, as discussed previously, the victims sprayed with the wasp spray at issue did not report any injury, disease, or death—rather, they merely reported feeling cold and wet. Further, the can's warning label, while it warns against the spray coming into contact with people or pets, does not say that injury, disease, or death can result from exposure. Unlike pepper spray, there was no evidence that the spray caused any effects that would "rise above mere irritant effects and qualify as injuries" such as blinding, paralysis of the larynx, and extreme pain. *Id*. at 624. On the record before this Court, we conclude that this case was an instance "where a milder chemical substance is used by a defendant as a weapon, but rather than causing debilitating pain and injury, it causes only a minor irritation on the victim's skin" and OV 1 accordingly should have been scored at 5 points.[3]

## 2. OV 7

Defendant argues that the trial court erred by assessing defendant 50 points under this OV. We agree.

OV 7 concerns aggravated physical abuse, and provides for a score of 50 points if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). In a multiple-offender situation, only the defendant's own actions may be considered when scoring OV

---

[3] Defendant also notes that OV 1 should have been scored at zero points for several of defendant's unlawful-imprisonment convictions. We note that for those convictions, a guidelines range was not required to be calculated at all, as will be discussed more fully in the next section of this opinion. See *People v Mack*, 265 Mich App 122, 128-129; 695 NW2d 342 (2005).

7. *People v Hunt*, 290 Mich App 317, 326; 810 NW2d 588 (2010). Regarding conduct designed to substantially increase fear and anxiety, our Supreme Court has stated that "it is proper to assess points under OV 7 for conduct that was intended to make a victim's fear or anxiety greater by a considerable amount." *People v Hardy*, 494 Mich 430, 441; 835 NW2d 340 (2013). All crimes against a person "involve the infliction of some amount of fear and anxiety." *Id*. at 442 (citation omitted). To assess points for OV 7 under the category of conduct designed to substantially increase fear and anxiety,

> a court must first determine a baseline for the amount of fear and anxiety experienced by a victim of the type of crime or crimes at issue. To make this determination, a court should consider the severity of the crime, the elements of the offense, and the different ways in which those elements can be satisfied. Then the court should determine, to the extent practicable, the fear or anxiety associated with the minimum conduct necessary to commit the offense. Finally, the court should closely examine the pertinent record evidence, including how the crime was actually committed by the defendant. As noted above, evidence which satisfies an element of an offense need not be disregarded solely for that reason. Instead, all relevant evidence should be closely examined to determine whether the defendant engaged in conduct beyond the minimum necessary to commit the crime, and whether it is more probable than not that such conduct was intended to make the victim's fear or anxiety increase by a considerable amount. [*Id*. at 442-443.]

In this case, the trial court held that defendant and his co-defendant, Cunningham, had engaged in egregious conduct designed to substantially increase a victim's fear and anxiety, stating in relevant part:

> . . . just focusing on the last part of, " . . . or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense," that clearly is here, but it's not – not only that it's clearly here, it's who did it. I mean, this was an otherwise loving relationship between a family that had . . . dinners and—and arguably, living conditions that were harmonious at some point. Now, to put the kids—and I guess the Quinns can get over it as they—they're adults and they can maybe understand it, but I don't know that that's even correct. But I mean, from a kid's point of view, to see their uncle come in with a friend, hogtie you, strangle you, kick you, beat you, beat your father, hogtie your mother, throw her in a car, and then proceed to beat a woman—a child—a female child is horrendous. It's offensive.
>
> There's no description that would make that OK. So, just from the kid's point of view alone, its [sic] gonna be OV—OV 7 will be scored at 50. There's no justification for what went on here and—and just, again, from the kids' point of view, irrespective of the Quinn's [sic] 'cause they're adults and maybe they could rationalize some of it, I suppose, but the kids, absolutely not.

The trial court's rationale for scoring OV 7 at 50 points was based in part on the fact that Cunningham was the child victims' uncle, and the previously harmonious familial relationship was shattered by Cunningham and defendant's violent acts. But defendant was not the children's uncle;

-11-

Paul testified that the family knew defendant "through George" and would see him "every now and again." Further, the testimony at trial indicated that Cunningham was the primary aggressor in cornering Maria, tying her up, and placing in the backseat of the Quinn's car. Cunningham was also the one who tied up and beat MAQ while defendant was in the kitchen with the other restrained victims. All in all, it appears that the trial court considered the conduct of the two offenders in the aggregate when deciding whether to score OV 7, which was error. *Hunt*, 290 Mich App at 326. Further, although the trial court was undoubtedly correct in noting that the children experienced significant fear and anxiety, it did not discuss whether defendant's conduct was *designed* to *substantially increase* that fear and anxiety, or follow the procedure set forth by our Supreme Court for making such a determination. *Hardy*, 494 Mich at 441-443. Accordingly, on the current record, we conclude that the trial court erred by scoring OV7 at 50 points.

### 3. OV 8

Defendant also argues that the trial court erred by assessing defendant 15 points for OV 8. We disagree.

OV 8 concerns victim asportation or captivity, and provides that a defendant be assessed 15 points if the sentencing offense is not kidnapping and a victim "was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." MCL 777.38(1)(a); see also *People v Barrera*, 500 Mich 14, 16-17; 892 NW2d 789 (2017).

The trial court assessed 15 points for OV 8 based on the fact that Maria was tied up and moved from her front yard to the backseat of a car. Defendant argues that the trial court erred by considering this conduct, because it occurred before the armed robbery or home invasion (the non-kidnapping offenses that were required to be scored as sentencing offenses, see *People v Mack*, 265 Mich App 122, 128-129; 695 NW2d 342 (2005); *People v Lopez*, 305 Mich App 686, 690-692; 854 NW2d 2014; see also MCL 777.14(2) occurred, noting that this Court has stated that victim asportation (OV 8) must be scored by reference to the sentencing offense alone. See *People v Allen*, 331 Mich App 587, 596; 953 NW2d 460 (2020), vacated in part on other grounds 507 Mich 856 (2021). While defendant is correct that victim asportation (OV 8) is to be scored using an offense-specific approach, see *id*., he is incorrect in his assertion that OV 8 must therefore be scored at zero points. The offense-specific approach to offense variable scoring "does not provide for consideration of conduct *after* the completion of the sentencing offense" and therefore OV 8 "must be scored solely on the basis of [defendant's] conduct *before or during* the sentencing offense." *Id*., citing *Barrera*, 500 Mich at 22; see also *People v McGraw*, 484 Mich 120, 124; 771 NW2d 655 (2009); See *People v Sargent*, 481 Mich 346, 349; 750 NW2d 161 (2008). In this case, Maria was tied up and moved to another location *during* the home invasion and armed robbery—we reject defendant's argument that the victim asportation was done and completed before the other offenses began. Indeed, defendant's asportation of Maria aided him in committing the home invasion and armed robbery by removing an adult from the people he would be confronted with once inside the home. We conclude that the trial court did not err by scoring OV 8 based on defendant's asportation of Maria.

We also reject defendant's argument that Maria was not taken to a "another place of greater danger or to a situation of greater danger." "Places or situations of great danger include, but are

-12-

not limited to, 'places where others [are] less likely to see defendant committing crimes.' " *Allen*, 331 Mich App 587, 597; 953 NW2d 460 (2020), quoting *People v Steele*, 283 Mich App 472, 491; 769 NW2d 256 (2009) (alteration in the original). By moving Maria from her front yard to the backseat of a nearby car, defendant decreased the chance that anything happening to Maria would be observed by witnesses or people who could intervene. "When evaluating the phrase 'to another place of greater danger or to a situation of greater danger,' trial courts must consider whether the risk of danger to the victim is increased by the defendant's movement of the victim." *Allen*, 331 Mich App at 598. While defendant may have indeed somewhat decreased Maria's risk of danger from the cold by moving her into the car, he did so by moving her to a place where her captivity or any further crimes against her would have been less likely to be witnessed. The trial court accordingly did not err by assessing 15 points for OV 8.

### 4. OV 10

Defendant also argues that the trial court erred by assessing ten points to defendant for OV 10. We agree.

OV 10 concerns the exploitation of a vulnerable victim. MCL 777.40(1). A trial court must assess ten points if "offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his authority status." MCL 777.40(1). To "exploit" is to manipulate a victim for selfish or unethical purposes. MCL 777.40(3)(b); *People v Cannon*, 481 Mich 152, 157; 749 NW2d 257 (2008); *People v Needham*, 299 Mich App 251, 253; 829 NW2d 329 (2013). "Vulnerability" is the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation. MCL 777.40(3)(c); *Cannon*, 481 Mich at 157; *Needham*, 299 Mich App at 253. The mere existence of one or more of the factors listed in MCL 777.40(1) does not automatically establish a victim's vulnerability. MCL 777.40(2); *Cannon*, 481 Mich at 157.

In this case, the only characteristic of any of the victims which defendant could have exploited was youth. But the record does not show that defendant exploited the youth of any of the victims in committing the offenses of which he was convicted. Although the record shows that Cunningham carried his son bodily from the home, as far as defendant's conduct goes, he was involved in serious combat with the two teenage boys in the home. Although defendant and Cunningham eventually prevailed, there is no evidence that defendant exploited any particular victim's youth. The mere fact that several of the victims in this case were minors was insufficient to score this variable, and the trial court accordingly erred by doing so. See *People v Taylor*, 486 Mich 904; 780 NW2d 833 (2010) (holding that this Court erred by affirming the trial court's score of OV 10 based solely on the victim's age compared to the age of the defendant).

### C. UNLAWFUL IMPRISONMENT GUIDELINES RANGE

Defendant also raises numerous challenges to the portion of the pre-sentence investigation report (PSIR) containing a guidelines range calculated for defendant's five unlawful imprisonment convictions. To summarize, defendant argues that it was error for the probation department to calculate one guidelines range for all five convictions, pointing out, for example, that scoring 15 points for OV 8 for all five convictions is incorrect, because only Maria was even arguably asported to a place of greater danger. We find any error related to this portion of the PSIR

harmless, because, as the unlawful imprisonment convictions were neither of the highest crime class nor crimes for which consecutive sentencing was authorized, the probation department and the trial court were not required to calculate a guidelines range for those convictions at all. See *Mack*, 265 Mich App at 128-129; *Lopez*, 305 Mich App at 690-692; see also MCL 777.14(2). Further, there is no evidence on the record that the trial court relied on the PSIR in sentencing defendant for those offenses. We find no error requiring reversal on this issue.

## D. CONCLUSION

Because the trial court failed to state particularized reasons for imposing a consecutive sentence for defendant's home invasion conviction, remand would be required, at a minimum, for the trial court to articulate such a reason. However, because we also conclude that several OVs were erroneously scored, and those errors affected the minimum sentence range recommended by the sentencing guidelines, remand for full resentencing is required. See *People v Francisco*, 474 Mich 82, 92; 711 NW2d 44 (2006). Accordingly, we remand for resentencing and return the case to the trial court in a "presentence posture, allowing the trial court to consider every aspect of defendant's sentences de novo," and permitting the parties to raise any issues related to sentencing. *People v* Rosenberg, 477 Mich 1076; 729 NW2d (2007); *People v Lampe*, 327 Mich App 104, 112; 933 NW2d 314 (2019).

We affirm defendant's convictions, vacate the sentences, and remand for resentencing. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Kathleen Jansen
/s/ Noah P. Hood

-14-