*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROY LEANDO SNELL,

        Defendant-Appellant.

UNPUBLISHED
May 11, 2026
10:19 AM

No. 366514
Newaygo Circuit Court
LC No. 2020-012411-FC

Before: BORRELLO, P.J., and M. J. KELLY and ACKERMAN, JJ.

PER CURIAM.

In 2022, a jury convicted defendant of first-degree felony murder, MCL 750.316(1)(b), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for a murder he committed in 1983, when he was 18 years old. The trial court sentenced defendant to life in prison without the possibility of parole, to be served consecutively to a two-year sentence for felony-firearm.

On appeal, defendant raises several claims of error. He contends that the trial court erred by denying his motion for a change of venue, deprived him of his rights to self-representation and confrontation, and improperly admitted opinion testimony. He also challenges the sufficiency of the evidence to support his convictions. Finally, he argues that the trial court failed to conduct a proper *Miller*[1] hearing and that trial counsel provided ineffective assistance in connection with that hearing. We affirm defendant's convictions but vacate his sentences and remand to the trial court for a new *Miller* hearing and resentencing.

## I. FACTUAL BACKGROUND

This case arises out of the 1983 disappearance of Richard Atwood and defendant's prosecution for Atwood's murder nearly four decades later. At the time of his disappearance on August 10, 1983, Atwood was 25 years old, lived in the White Cloud area, and was known to sell

---

[1] *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

marijuana and carry large amounts of cash. He drove a 1976 Pontiac Trans Am, which he kept meticulously clean. Defendant, who was then 18 years old, also lived in the White Cloud area and was a known acquaintance of Atwood.

On the morning of his disappearance, Atwood told his girlfriend, Debra Cain, that he planned to drive to Grand Rapids, and Cain saw him at a gas station in White Cloud later that day. Atwood never returned home, and his mother and Cain subsequently reported his disappearance to the police. Michigan State Police Detective Richard Miller, then the lead investigator on the case, posted a bulletin to locate Atwood's Trans Am and learned that it had been abandoned on August 10 or 11 at the Gateway Motel in Grand Rapids and was subsequently towed to a service station. Upon inspection, Detective Miller observed the vehicle to be filthy, as though it had been driven through mud. He collected cigarette butts from the ashtray and suspected bloodstains from within the vehicle and inside the trunk. The investigation then shifted from a missing-person case to a homicide case. Atwood's body was never found.

Witnesses who knew Atwood and defendant informed Detective Miller that defendant had discussed a plan to rob Atwood. Detective Miller learned that the Gateway Motel registrant who abandoned Atwood's Trans Am made phone calls to defendant's father and another person in the White Cloud area. The detective interviewed defendant and obtained a sample of his handwriting to compare with the handwriting on the motel registration card, but the investigation soon stalled.

In 2019, the state police obtained DNA analysis of the bloodstains and cigarette butts collected from the Trans Am. The bloodstain DNA was compared to samples from Atwood's parents and showed a parent-child relationship, and DNA from the cigarette butts was consistent with defendant's DNA profile.

## II. PROCEDURAL HISTORY

In 2020, the attorney general filed criminal charges of felony murder and felony-firearm against defendant, who was then in his fifties and suffering from serious medical problems requiring kidney dialysis. Because it was not possible to determine where the murder occurred, the attorney general designated Newaygo County as the appropriate venue for the proceedings. Defendant later unsuccessfully moved for a change of venue to Kent County.

Defendant's first appointed counsel, Rick Prysock, moved to withdraw eight months prior to trial after defendant filed a grievance against him. Seven months after the court appointed Stephanie Koorndyk as defense counsel, Koorndyk also moved to withdraw on the basis that defendant had filed a grievance against her, but the trial court denied that motion. Koorndyk thereafter represented defendant in a seven-day trial,[2] at the conclusion of which the jury convicted defendant of both charges.

Because defendant was 18 at the time of the homicide, he was not subject to a mandatory sentence of life in prison without the possibility of parole (LWOP). See *People v Parks*, 510 Mich 225, 244; 987 NW2d 161 (2022). The prosecution therefore moved the trial court to impose a

---

[2] References to "trial counsel" in this opinion thus reference Koorndyk.

sentence of LWOP under MCL 769.25, and the trial court conducted a hearing under *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), to determine whether such a sentence was appropriate in this case. Trial counsel retained a mitigation expert to testify regarding the mitigating effects of defendant's youth at the time of the instant offenses, but a different representative from the same firm appeared and testified at the *Miller* hearing. At the conclusion of the hearing, the trial court found that LWOP was an appropriate sentence in this case, referencing defendant's substantial criminal history since Atwood's murder in 1983 and concluding that defendant could not be rehabilitated. This appeal followed.

## III. DISCUSSION

### A. RIGHT TO COUNSEL OF CHOICE

Defendant first argues that the trial court deprived him of his right to counsel of his choice when it denied trial counsel's motion to withdraw. We review for an abuse of discretion a trial court's decision affecting a defendant's right to counsel of choice. *People v Akins*, 259 Mich App 545, 556; 675 NW2d 863 (2003). "An abuse of discretion occurs when the trial court chooses an outcome that is outside the range of principled outcomes." *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017).

Both the United States and Michigan constitutions guarantee a defendant's right to counsel. US Const, Am VI; Const 1963, art 1, § 20; *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004). But a defendant "is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced." *People v Buie*, 298 Mich App 50, 67; 825 NW2d 361 (2012) (citation omitted). "A defendant is only entitled to a substitution of appointed counsel when discharge of the first attorney is for good cause and does not disrupt the judicial process." *Id*. (quotation marks and citation omitted).

Good cause may exist when there is a legitimate disagreement concerning "a fundamental trial tactic," or "when there is a destruction of communication and a breakdown in the attorney-client relationship, or when counsel shows a lack of diligence or interest." *People v McFall*, 309 Mich App 377, 383; 873 NW2d 112 (2015) (quotation marks and citation omitted). "A mere allegation that a defendant lacks confidence in his or her attorney, unsupported by a substantial reason, does not amount to adequate cause. Likewise, a defendant's general unhappiness with counsel's representation is insufficient." *Id*. (citation omitted). Further, "a defendant may not deliberately cause a breakdown of the attorney-client relationship by not cooperating with his counsel and then assert that there is a good reason for appointing new counsel." *Buie*, 298 Mich App at 68.

In this case, trial counsel moved to withdraw ten days before trial was scheduled to begin, alleging a breakdown in the attorney-client relationship. Counsel explained that defendant refused to communicate with her, that her response to his grievance against her "could potentially hurt" his case, and that he had sent her multiple letters "indicating that he wished to represent himself," though she advised against self-representation. At the hearing on counsel's motion, counsel elaborated that she spoke with a representative from the Michigan Indigent Defense Commission (MIDC), who stated that MIDC was unwilling to appoint a third attorney to represent defendant. Counsel represented that she had met with defendant at least twice since her appointment and was

prepared to go forward with the trial, but she believed defendant "would disagree with that," and the relationship had "broken to a point where there is no communication."

The court asked defendant's position on counsel's request to withdraw, and defendant responded:

> She ain't [sic] been representing me. I ain't [sic] seen the lady in six or seven months. I saw her (inaudible) the original police report, the original grand jury testimony where William Rollstin tried that case, suppressed evidence, obstructive [sic] justice. There was no physical evidence. All that—he can't—(inaudible) the detective out of retirement. Ain't [sic] no way—no way in hell I'm about to go to trial. You ain't [sic] allow me in your court. I mean, come on now. If you're going to be the judge, make it fair. What he's doing ain't [sic] fair. And look at what y'all gave me. Y'all gave me a public pretender. If she was a lawyer, she would have been up here fighting my case. Everything that she said, that's some bullshit. I don't want that bitch.

He later elaborated that trial counsel had not met with him at the jail in seven months and did not file motions he requested, and he asked the trial court to "[g]ive [him] a real lawyer."

The trial court concluded that defendant's dissatisfaction with counsel's representation was not reasonable because she made diligent efforts to prepare for trial and "a grievance alone is not enough to show good cause" for a substitution of counsel. The court credited counsel's representation that she had visited defendant multiple times and found that she had been appropriately preparing for trial. The court also noted that defendant had a history of failing to cooperate with his attorneys, which had resulted in the substitution of his first court-appointed counsel, and that MIDC was unwilling to appoint a third attorney. Finally, the court found that granting the request "would cause a serious disruption" in the case, which had already been pending for two years. It therefore denied the motion to withdraw.

The trial court did not abuse its discretion in so doing. Defendant's complaints of counsel's inadequacy, which consisted primarily of name-calling and generalized attacks on the proceeding, were insufficient to establish good cause for appointing new counsel. See *McFall*, 309 Mich App at 383. Although defendant alleged that counsel had not met with him to prepare for trial in seven months, the court concluded that defendant had not established that counsel showed a lack of diligence or interest. That finding was supported by counsel's representations that she had met with defendant the previous month and was prepared to proceed with trial the following week, and the finding was therefore not clearly erroneous. Further, defendant's bare assertion that counsel failed to file unspecified motions at his request was not sufficient to establish a legitimate disagreement concerning a fundamental trial tactic. Finally, to the extent that defendant refused to cooperate or communicate with counsel, "this Court has held that a defendant may not deliberately cause a breakdown of the attorney-client relationship by not cooperating with his counsel and then assert that there is a good reason for appointing new counsel." *Buie*, 298 Mich App at 68. Under these circumstances, the trial court did not abuse its discretion by denying trial counsel's motion to withdraw as counsel.

## B. REQUEST FOR SELF-REPRESENTATION

Defendant next contends that he timely and unequivocally asserted his desire to represent himself before trial, but the trial court did not conduct the requisite inquiries under MCR 6.005(D) and *People v Anderson*, 398 Mich 361; 247 NW2d 857 (1976), effectively depriving him of his right to represent himself. We review for an abuse of discretion a trial court's decision regarding a defendant's request for self-representation. *People v Spears*, 346 Mich App 494, 502; 13 NW3d 20 (2023).

The right of self-representation is secured by the federal and state constitutions and by state statute. *Anderson*, 398 Mich at 366, citing US Const, Am VI, Const 1963, art 1, § 13, and MCL 763.1. "Although the right to counsel and the right of self-representation are both fundamental constitutional rights, representation by counsel, as a guarantor of a fair trial, is the standard, not the exception, in the absence of a proper waiver." *Spears*, 346 Mich App at 504-505 (cleaned up).

> To invoke the right of self-representation: (1) a defendant must make an unequivocal request to represent himself, (2) the trial court must determine that the choice to proceed without counsel is knowing, intelligent, and voluntary, and (3) the trial court must determine that the defendant's acting as his own counsel will not disrupt, unduly inconvenience and burden the court and the administration of the court's business. [*Id.* at 505, quoting *People v Dunigan*, 299 Mich App 579, 587; 831 NW2d 243 (2013).]

"In addition, before accepting a waiver of counsel, the trial court must satisfy the requirements of MCR 6.005 and inform the defendant of the risks of self-representation." *People v Belanger*, 227 Mich App 637, 642; 576 NW2d 703 (1998). But only an unequivocal request for self-representation triggers a trial court's duty to determine whether the choice to proceed without counsel is knowing, intelligent, and voluntary, and whether self-representation will disrupt, unduly inconvenience, or burden the court. *Spears*, 346 Mich App at 505-506.

According to defendant, he expressed an unequivocal desire to represent himself on several occasions: (1) at the hearing on Prysock's motion to withdraw; (2) in trial counsel's written motion to withdraw; and (3) at the hearing on that motion. In the first instance, defendant indicated that he did not want new counsel appointed if the court granted Prysock's motion and, after the court granted the motion, defendant stated, "I can represent myself. I don't need no attorney." Then, in trial counsel's written motion to withdraw, she represented that defendant had "sent numerous letters to Counsel's office indicating that he wished to represent himself." Finally, at the hearing on that motion, counsel reiterated that defendant had sent her letters expressing a desire for self-representation. At the conclusion of that hearing, the court noted that any ex parte communications defendant may have sent to the court requesting self-representation were not reviewed by the court but were instead forwarded to his appointed counsel, so the court "was never made aware that he had ever made any requests to represent himself."[3] The court found that, even if defendant had

---

[3] Defendant's letters to the trial court are not contained in the lower court record, and defendant has not asked this Court to expand the record under MCR 7.216(A)(4), nor has he furnished this

properly requested self-representation, such a request would be denied as untimely and because it would disrupt the proceedings.

Defendant claims that the trial court's failure to conduct the inquiries required by *Anderson* and MCR 6.005 effectively deprived him of his right to self-representation. We disagree because the record does not establish that defendant unequivocally asserted that right. During the hearing on Prysock's motion to withdraw, defendant's request for self-representation was conditioned on the court granting the motion, rendering the request equivocal. See *People v Dennany*, 445 Mich 412, 444-445; 519 NW2d 128 (1994) (holding that a conditional request for self-representation is not an unequivocal invocation of that right). Moreover, as our Supreme Court has explained:

> [T]o the degree that defendant's refusal to explicitly choose between continued representation by appointed counsel and self-representation created any ambiguity regarding defendant's desire to unequivocally waive his right to trial counsel, any ambiguity should have been resolved in favor of representation because . . . courts *must* indulge every reasonable presumption against the waiver of the right to counsel. [*Russell*, 471 Mich at 193.]

Defendant's requests for self-representation in trial counsel's written motion to withdraw and those made at the hearing on that motion were also equivocal. Though counsel's motion stated that defendant wished to represent himself, the motion also indicated that defendant "underst[ood] a change in counsel would further delay the proceedings" and that counsel stood "ready, willing, and able to deliver all documents relating to the case either to Defendant directly, or to any subsequent Counsel that is brought into the case." And when defendant addressed the court concerning counsel's motion at the subsequent hearing, he stated that counsel was not a "proper defense" and said, "Give me a real lawyer." A defendant who requests substitute counsel or merely expresses dissatisfaction with counsel has not unequivocally requested self-representation. See, e.g., *United States v Martin*, 25 F3d 293, 296 (CA 6, 1994); *People v Payne*, 27 Mich App 133, 135-136; 183 NW2d 371 (1970). By refusing to explicitly choose between self-representation and representation by counsel, defendant failed to unequivocally assert his right to represent himself. See *Russell*, 471 Mich at 193.

Defendant did not unequivocally request self-representation, so "the trial court had no duty to determine whether defendant knowingly, intelligently, and voluntarily wished to represent himself, or whether self-representation would have disrupted, inconvenienced, or burdened the court." *Spears*, 346 Mich App at 505-506. The trial court therefore did not abuse its discretion by declining to address that request. See *id*. at 505 ("However, defendant never unequivocally

Court with those documents such that we could consider them. To the extent that he now argues he unequivocally asserted his right to self-representation in those letters, he has failed to establish the factual predicate for that claim. See MCR 7.210(A) ("Appeals to the Court of Appeals are heard on the original record."); see also *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 355554); slip op at 19 (holding that a defendant fails to establish the factual predicate for a claim of error when the facts asserted are supported only by documents outside of the record).

requested to represent himself, so the trial court did not abuse its discretion by 'failing' to address this request or by otherwise 'denying' self-representation.").

C. VENUE

Defendant next asserts that the trial court erred in denying his motion for a change of venue. We review for an abuse of discretion a trial court's denial of a motion to change venue. *People v Jendrzejewski*, 455 Mich 495, 500; 566 NW2d 530 (1997).

In this case, the attorney general alleged that it was not possible to determine the location of the homicide and therefore designated Newaygo County as the appropriate venue under MCL 762.3(2). Defendant later moved for a change of venue to Kent County because there was no evidence that Atwood was murdered in Newaygo, and because police located Atwood's vehicle, "the only significant piece of evidence that has been recovered," in Kent. Defendant also asserted that he could not receive a fair trial in Newaygo County due to publicity regarding the case, nor could he receive his right to a jury drawn from a fair cross section of the community because only 1.2% of Newaygo's population is, like defendant, African American.

The trial court denied the motion, concluding that the prosecution properly designated venue in Newaygo County. It further found that defendant failed to satisfy his burden under MCL 762.7 to establish good cause for a change of venue, concluding that defendant had not shown that prospective jurors had been influenced by pretrial publicity and had not presented evidence concerning the county's population demographics. The court thus concluded that, "at [that] point in the proceedings," it was "not convinced that a change of venue is necessary to ensure an impartial jury."

On appeal, defendant maintains that it was not impossible to determine where the murder occurred, noting that the prosecution's evidence supported the theory that Atwood was murdered in Kent County, and it was therefore improper to designate Newaygo as the trial venue under MCL 762.3(2). We disagree.

Concerning venue, "[t]he general rule is that a criminal trial should be by a jury of the county or city where the offense was committed." *People v White*, 509 Mich 96, 102; 983 NW2d 348 (2022) (quotation marks and citation omitted). But when it is not possible to determine in which county the offense was committed, "the offense may be alleged in the indictment to have been committed and may be prosecuted and punished in such county as the attorney general designates." MCL 762.3(2).

Here, police never recovered Atwood's body or any evidence that conclusively identified the location of the murder. Though it is true that some evidence—such as testimony that the victim's vehicle was found in Grand Rapids—supports an inference that the murder occurred in Kent County, other evidence suggested that the crime took place in Newaygo. The victim was last seen alive in Newaygo County, where witness testimony placed defendant and the victim together in the victim's Trans Am. Nolan Gant, who shared adjoining cells with defendant while defendant was incarcerated on unrelated charges in 1985, testified that defendant admitted to shooting a man in the man's Trans Am and then traveling to a motel, where defendant was staying with his girlfriend. Defendant told Gant that he buried the victim's body on property owned by defendant's

father in Newaygo County.  Considering the lack of conclusive evidence concerning the location of Atwood's murder, the trial court did not err by allowing the prosecution to designate Newaygo County as the proper venue under MCL 762.3(2).

Defendant also argues on appeal that he established good cause for a change of venue based on pretrial publicity and community bias.  But the trial court's order denying the motion on those bases indicated that it would be willing to reconsider the motion at a later time, noting that it was unconvinced "at [that] point in time" that a change of venue was necessary.  Defendant did not renew his motion on those bases after jury selection, and trial counsel expressed satisfaction with the jurors selected.  Defendant thereby waived appellate consideration of those challenges.  See *People v Clark*, 243 Mich App 424, 426; 622 NW2d 344 (2000).

## D. UNAVAILABLE WITNESS TESTIMONY

Defendant next challenges the trial court's admission of Detective Miller's preliminary-examination testimony at trial under MRE 804.[4]  We review a trial court's evidentiary rulings for an abuse of discretion.  *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019).  Any preliminary questions of law, including whether evidence is inadmissible under the rules of evidence, are reviewed de novo.  *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).  But this Court will not reverse a verdict because of evidentiary error unless, "after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."  MCL 769.26.  The defendant bears the burden of establishing that, "absent the error, it is more probable than not that a different outcome would have resulted."  *People v Gursky*, 486 Mich 596, 619; 786 NW2d 579 (2010) (applying harmless-error review to preserved claims of nonconstitutional error); see also *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005) (applying harmless-error review to claims of error brought under the Confrontation Clause).  Regarding a Confrontation Clause challenge, "a reviewing court must conduct a thorough examination of the record in order to evaluate whether it is clear, beyond a reasonable doubt, that the jury verdict would have been the same absent the error."  *Shepherd*, 472 Mich at 348 (quotation marks and citation omitted).

"In general, hearsay—an out-of-court statement offered to prove the truth of the matter asserted—may not be admitted into evidence."  *People v Green*, 313 Mich App 526, 531; 884 NW2d 838 (2015), citing MRE 801 and MRE 802.  But MRE 804 provides exceptions to the general prohibition of hearsay evidence for certain statements made by a declarant who is unavailable, including "[t]estimony given as a witness at another hearing . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."  MRE 804(b)(1).  A declarant is unavailable when, as relevant here, he or she "has a lack of memory of the subject matter of the declarant's statement," MRE 804(a)(3), or "is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity," MRE 804(a)(4).  The trial court's determination of whether a witness is unavailable under MRE 804(a) "will not be disturbed on

---

[4] All references to the Michigan Rules of Evidence refer to the version of the rules in effect at the time of trial.

appeal unless a clear abuse of discretion is shown." *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998).

In criminal proceedings, introduction of prior testimony implicates a defendant's right to cross-examine witnesses. The United States and Michigan constitutions guarantee an accused's right to confront witnesses against him or her. US Const, Am VI; Const 1963, art 1, § 20. "Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009); accord *Crawford v Washington*, 541 US 36, 51-52, 54-55, 68-69; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

In this case, the prosecution moved the trial court to declare Detective Miller, the original lead investigator, an unavailable witness under MRE 804(a)(3) and (4), and it asked the court to admit his preliminary-examination testimony under MRE 804(b)(1). The court heard testimony from Detective Scott Rios, who became lead investigator after Detective Miller's retirement 10 years before trial, regarding Detective Miller's condition. Detective Rios testified that he had known Detective Miller since 1997, when they worked together at a state police post, and Detective Rios had observed changes in Detective Miller since his retirement. Detective Miller and his wife informed Detective Rios that Detective Miller had been diagnosed with Parkinson's disease and dementia. Detective Rios testified that Detective Miller experienced hallucinations and sometimes "froze" during conversations, when his head would drop and he would begin to drool.

Over defendant's objection, the trial court found Detective Miller to be an unavailable witness because his Parkinson's disease and dementia prevented him from testifying, and it therefore admitted his preliminary-examination testimony under MRE 804(b)(1). On appeal, defendant contends that the trial court improperly relied on hearsay testimony in finding that Detective Miller was unavailable. He also argues that the admission of the preliminary-examination testimony violated his right of confrontation. We disagree as to both claims.

Turning first to his hearsay argument, defendant submits that Detective Rios's testimony concerning Detective Miller's Parkinson's and dementia diagnoses was inadmissible hearsay because that information was relayed by Detective Miller and his wife. It is true that the statements from Detective Miller and his wife about his diagnoses were hearsay to the extent they were offered to prove the existence of those diagnoses. See MRE 801(c). But the trial court's unavailability finding did not depend solely on the formal diagnoses. Detective Rios also testified to his own personal observations of Detective Miller's condition, including that the retired detective would "struggle and freeze" when answering questions. Detective Rios's description of Detective Miller's diminishing ability to respond to questions and participate in conversations provided a sufficient basis for the trial court to determine that Detective Miller was unable to testify because of a then-existing physical or mental illness or infirmity. MRE 804(a)(4). Accordingly, the trial court did not abuse its discretion by finding that Detective Miller was unavailable.

Defendant also claims that admission of the preliminary-examination testimony violated his right of confrontation because the defense did not have a full and fair opportunity to cross-examine Detective Miller at the preliminary examination. He emphasizes that Prysock, who represented him at the preliminary examination, had only 51 days to prepare between his

appointment as counsel and the examination, and he contends that this was not sufficient time to review the voluminous discovery accumulated since 1983.

The Confrontation Clause guarantees an opportunity for effective cross-examination, but not cross-examination to whatever extent or in whatever manner a defendant may wish. *People v Sardy*, 318 Mich App 558, 564; 899 NW2d 107 (2017). Cross-examination is sufficient if the party against whom the testimony is offered had an opportunity to attack a witness's credibility, including the witness's "possible biases, prejudices, or ulterior motives," and had a similar motive to do so. *Davis v Alaska*, 415 US 308, 316; 94 S Ct 1105; 39 L Ed 2d 347 (1974); *People v Layher*, 238 Mich App 573, 579; 607 NW2d 91 (1999). Although "the preliminary hearing is ordinarily a less searching exploration into the merits of a case than a trial," prior testimony may still satisfy the Confrontation Clause where, as here, defendant was not "significantly limited in any way in the scope or nature of his cross-examination of the witness . . . at the preliminary hearing." *California v Green*, 399 US 149, 166; 90 S Ct 1930; 26 L Ed 2d 489 (1970).

Prysock's cross-examination of Detective Miller satisfied those requirements. Prysock had the opportunity to cross-examine Detective Miller, and his cross-examination spans 18 pages of the hearing transcript. Defendant relies on statements he made in the trial court after the reading of Detective Miller's testimony as proof of how he would have expanded the cross-examination had the detective testified at trial. In those statements, defendant made imprecise references to police reports apparently indicating that other suspects had made statements about robbing the victim, as well as the fact that four hospitals had samples of the victim's DNA. The trial court found that trial counsel could explore those issues through other witnesses and argue them in closing.

We find no error in the trial court's ruling. Defendant's vague statements do not establish that he was significantly limited in the scope or nature of his cross-examination of Detective Miller during the preliminary examination. Defendant's theory that the preliminary examination omitted vital opportunities for cross-examination is thus speculative and does not demonstrate that admission of Detective Miller's prior testimony violated his rights under the Confrontation Clause.

### E. OPINION TESTIMONY

Defendant next claims that Detective Miller improperly commented on defendant's guilt in his preliminary-examination testimony when the detective testified about his interview of defendant. Specifically, defendant challenges Detective Miller's testimony that: (1) it was "obvious" to the detective that defendant "had information that he was trying to conceal and did not want to talk about"; (2) it was "obvious" to the detective that defendant was trying to "disguise" his handwriting when giving the handwriting sample; and (3) he focused on defendant as a suspect in this case because "[a]ll the evidence went directly to" defendant.

Though defendant was aware of the substance of that testimony and of the prosecution's intent to present the testimony to the jury, in advance of trial, defendant did not object to the complained-of testimony or request that those statements be redacted, and the issue is therefore unpreserved. See MRE 103(a)(1). We review unpreserved evidentiary challenges for plain error affecting substantial rights. *People v Lowrey*, 342 Mich App 99, 108; 993 NW2d 62 (2022). To satisfy that standard, a defendant must show that "(1) an error occurred, (2) the error was plain,

-10-

i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) (cleaned up). Even if those requirements are met, reversal is warranted only if the error "resulted in the conviction of an actually innocent defendant" or "seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (cleaned up).

A police officer may not "express an opinion on the defendant's guilt or innocence of the charged offense" because doing so "invade[s] the province of the jury." *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013) (quotation marks and citation omitted). But under MRE 701, a lay witness may give opinion testimony if it is rationally based on the witness's perception and helpful to clearly understanding the witness's testimony or determining a fact in issue. Police officers are included as lay witnesses when not testifying as experts. *Fomby*, 300 Mich App at 50. Police officers may testify concerning their opinions while explaining the steps of their investigation based on their personal perceptions. *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012).

None of Detective Miller's allegedly improper statements directly stated an opinion that defendant was guilty. The statement that defendant appeared to be trying to conceal information was related to Detective Miller's investigation and the steps that he pursued as he gathered and developed information. Detective Miller initially linked defendant to the homicide because the Gateway Motel registrant who abandoned the Trans Am made a phone call to defendant's father. Although defendant was "just another person out there" when Detective Miller interviewed him, Detective Miller observed that defendant was evasive, as if he was trying to conceal something. This testimony explained why Detective Miller continued to focus on defendant.

Detective Miller also did not simply opine, without explanation, that defendant was trying to disguise his handwriting. He described his observation that defendant wrote the exemplar "very painfully, painfully slow," which explained why Detective Miller considered it "obvious . . . that he was trying to disguise his writing." Finally, Detective Miller testified that defendant was the only suspect he identified because all of the evidence pointed to defendant. Viewed in context, that testimony explained the course of the investigation and why Detective Miller did not pursue other suspects; it was not a direct opinion that defendant was guilty. To the extent that the testimony implied that Detective Miller formed such an opinion, the error did not rise to the level of plain error affecting defendant's substantial rights. *Lowrey*, 342 Mich App at 108.[5]

### F. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that trial counsel provided ineffective assistance at his *Miller* hearing, and he seeks resentencing on that basis. "Whether a defendant has received ineffective assistance of counsel is a mixed question of fact and constitutional law." *People v Yeager*, 511

---

[5] Defendant relatedly argues that trial counsel was ineffective for failing to object to Detective Miller's opinion testimony. Because the remarks were not improper, any objection would have been futile. "Counsel is not ineffective for declining to raise a futile objection." *People v Muniz*, 343 Mich App 437, 449; 997 NW2d 325 (2022).

Mich 478, 487; 999 NW2d 490 (2023). "A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *Id*. (citation omitted). We review the trial court's factual findings for clear error and questions of law de novo. *Id*. When no *Ginther*[6] hearing has been conducted, "our review is limited to mistakes that are apparent from the record." *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019).

Both the Michigan and United States constitutions guarantee criminal defendants the right to the assistance of counsel. Const 1963, art I, § 20; US Const, Am VI. "This right guarantees the effective assistance of counsel." *Yeager*, 511 Mich at 488, citing *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). A defendant seeking relief on the basis of ineffective assistance of counsel "must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

Because the ineffective-assistance claim concerns trial counsel's handling of the *Miller* hearing, we begin there. In *Miller*, 567 US at 476, the United States Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment precludes mandatory sentences of life without parole for crimes committed when the offender was under 18 years old. See also *People v Taylor*, 510 Mich 112, 126; 987 NW2d 132 (2022). The *Miller* Court identified five factors to be considered "before concluding that it is appropriate to sentence a juvenile offender to die in prison." *Taylor*, 510 Mich at 126. Those factors are:

> (1) the juvenile's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile's family and home environment—from which he cannot usually extricate himself—no matter how brutal or dysfunctional; (3) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him; (4) the incompetencies of youth, which affect whether the juvenile might have been charged with and convicted of a lesser crime, for example, because the juvenile was unable to deal with law enforcement or prosecutors or because the juvenile did not have the capacity to assist their attorney in their own defense; and (5) the juvenile's possibility of rehabilitation. [*Id*. at 126 (quotation marks and citation omitted).]

The *Miller* factors have been "expressly incorporated into the state's discretionary juvenile LWOP sentencing scheme." *Taylor*, 510 Mich at 126, citing MCL 769.25(6). In *Parks*, our Supreme Court summarized the requirements of those statutes:

> The statutes require the court to sentence a defendant to at least a 60-year maximum term and a minimum term of not less than 25 years or more than 40 years, unless the prosecuting attorney files a motion seeking a sentence of life without parole. MCL 769.25a(4)(b) and (c); MCL 769.25(3) and (9). If the prosecutor seeks a

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

sentence of life without parole, the trial court must conduct a hearing and consider the *Miller* factors, any other relevant criteria, and the defendant's record while incarcerated. MCL 769.25a(4)(b); MCL 769.25(6). [*Parks*, 510 Mich at 240.]

"[T]he combination of *Miller* and MCL 769.25 creates a rebuttable presumption against life-without-parole sentences for juvenile offenders," and "the prosecution, as the moving party, must overcome this presumption by clear and convincing evidence." *Parks*, 510 Mich at 240-241. The *Parks* Court extended the prohibition against mandatory life sentences for juvenile offenders to offenders who were 18 years old at the time of the offense. *Id*. at 244. Accordingly, because defendant was 18 when the homicide occurred, he became entitled to a *Miller* hearing under MCL 769.25a(4)(b) once the prosecution requested a sentence of LWOP.

Before the *Miller* hearing, counsel moved the trial court to appoint a mitigation expert, and the court granted defendant $2,000 to retain such an expert. Counsel thereafter retained Cara Venning of the firm Venning and Associates, LLC, to testify regarding the mitigating effects of defendant's youth at the time of the instant offenses. But it was Cara's sister, Cori Venning, who actually appeared and testified at the *Miller* hearing. Cori explained that mitigation involves "present[ing] life histories of a defendant into consideration before sentencing," and the process typically requires "a minimum of 12 months up until a resolution." But counsel had retained the firm only two months before the hearing, and Cori had done little more than interview defendant by the time of her testimony. She provided only limited insight into defendant's educational background and childhood because she did not have sufficient time to obtain and review necessary records and had not reviewed his case file.

On appeal, defendant asserts that a mitigation expert was essential to his ability to present mitigating evidence, and trial counsel was ineffective because she failed to retain a qualified expert or request an adjournment to allow the expert more time to complete the necessary mitigation investigation. According to defendant, a qualified expert would have testified that his youthful attributes at the time of the homicide mitigated his culpability for the crime. That expert also would have informed the court that defendant experienced parental abuse and neglect, unstable living conditions, untreated mental illness, and educational disadvantages throughout his childhood.

In *People v Williams*, 328 Mich App 408, 413-414; 938 NW2d 42 (2019), this Court held that a "defendant is constitutionally entitled to some level of funding for mitigation experts." Although that case did not involve an ineffective-assistance claim, it is instructive as to the importance of mitigation expert testimony at a *Miller* hearing. Our Supreme Court has recognized that the failure to present expert testimony can constitute ineffective assistance of counsel. *People v Ackley*, 497 Mich 381, 383; 870 NW2d 858 (2015).

At the hearing, trial counsel disputed Cori's assertion that the firm was retained two months before the hearing, claiming that she retained the firm five months earlier. Counsel confirmed that she had not had any contact with Cori until one week prior to the hearing but asserted it was "no fault of [her] client" or herself, blaming the firm for the lack of contact. Even accepting those assertions as true, counsel nonetheless failed to present competent expert testimony at the *Miller* hearing. Cori was plainly unprepared to testify. She admitted that she did not review records she typically would have reviewed, either because she did not receive them or because she did not

have sufficient time to review them.  She was unable to answer even basic questions about defendant's educational background, childhood, or correctional history.  An expert witness who has only rudimentary facts and has done no work beyond a scant intake is only a nominal improvement over no expert testimony.

Counsel clearly recognized the necessity of a mitigation expert in this case, as evidenced by her successful request for funds to retain one.  Although counsel blamed the mitigation firm for Cori's lack of preparedness, it was ultimately counsel's responsibility to select a reliable expert and ensure that the expert was reasonably prepared to testify in mitigation, and her failure to do so falls below an objective standard of reasonableness.  See *Ake v Oklahoma*, 470 US 68, 82-83; 105 S Ct 1087; 84 L Ed 2d 53 (1985) (acknowledging a defendant's constitutional right to a competent expert); *People v Harris*, 185 Mich App 100, 105; 460 NW2d 239 (1990) (holding that trial counsel's failure to advocate for the defendant at sentencing by not arguing "for mitigation of the sentence" can constitute deficient performance).

Defendant must also demonstrate that "but for counsel's deficient performance, a different result would have been reasonably probable." *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011).  The premise of both *Miller*, 567 US 460, and *Parks*, 510 Mich 225, is that mandatory life-without-parole sentences are inherently unfair for young offenders for two principal reasons: first, a young offender's immaturity may lessen the offender's culpability; and second, young offenders generally have greater potential for rehabilitation.  *Miller* established five factors that a sentencing court must consider, which "include: (1) chronological age and immaturity, impetuosity, and the failure to appreciate risks and consequences; (2) the offender's family and home environment; (3) circumstances of the offense, including the extent of participation in the criminal conduct and the effect of familial and peer pressures; (4) the effect of the offender's youth on the criminal-justice process, such as the offender's inability to comprehend a plea bargain; and (5) the possibility of rehabilitation." *Parks*, 510 Mich at 238, citing *Miller*, 567 US at 477-478.

The trial court considered the evidence and the *Miller* factors and concluded that the prosecutor rebutted the presumption against LWOP.  It found that immaturity was not a factor in the murder, noting that defendant, who had dropped out of high school, had already received his GED by the time of Atwood's killing.  Concerning the second *Miller* factor, the court determined that defendant's "home and family environment . . . was paradise," defendant did not "want for anything," and he was close with his family.  The court found nothing mitigating about the circumstances surrounding the offense, highlighting that there was no evidence that defendant was pressured into the crimes.  Because defendant was not tried for the instant offenses until he was in his fifties, the court found—and the parties agree—that the fourth *Miller* factor is not relevant.  Finally, because of the extensive criminal record defendant had acquired in the years since the murder, the court concluded that there was little possibility of rehabilitation.

On appeal, defendant moved this Court to remand for a *Ginther* hearing,[7] and he accompanied the motion with an offer of proof regarding the evidence a competent and prepared

---

[7] A panel of this Court denied that motion "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar." *People v Snell*, unpublished order of the Court of Appeals, entered April 16, 2025 (Docket No. 366514).

-14-

mitigation expert could have offered. Defendant's appellate counsel executed an affidavit regarding information related to trial counsel's preparation for the *Miller* hearing. Trial counsel had no prior experience with *Miller* hearings and did not believe that the trial court would allow more time for preparation. Although trial counsel believed that she could obtain more funds for an expert than the court initially granted, she did not request additional funds. The time and money constraints impeded counsel's search for a mitigation expert, but she was able to retain Cara Venning. Counsel understood that Cara would review defendant's school and medical records, review his family history, and suggest other experts. Counsel was surprised when Cori appeared to testify at the hearing. Those circumstances left counsel unable to present any meaningful evidence on defendant's behalf. Counsel believed that she could have found a more effective mitigation specialist if she had more time and more funds.

Appellate counsel obtained a mitigation expert, Mary Cuddehe, to prepare a written report on defendant's history. Cuddehe discovered ample evidence that defendant suffered physical and emotional abuse, neglect, and other traumatic events throughout his childhood, and that he was diagnosed with bipolar disorder and major depression. Defendant also asserts that *Miller* hearings usually include expert testimony by a specialist in adolescent brain development who could explain "why the make-up of an adolescent brain makes an 18-year-old who commits murder less culpable than an adult who commits murder." Corrections experts and psychological experts can also "provide context to criminal histories, prison records, and can opine on the presence of mental health issues."

The offer of proof demonstrates that counsel could have presented a substantially stronger case for a less severe sentence if she had sought an adjournment of the original *Miller* hearing and better prepared the mitigation expert. Cuddehe's written report details numerous adverse childhood experiences and mental health issues that are relevant to the *Miller* factors and were not presented to the trial court. The court placed significant weight on its conclusion that defendant had an idyllic family and home environment, a finding called into question by the offer of proof. On this record, defendant has established a reasonable probability of a different outcome but for counsel's deficient performance. We therefore vacate defendant's sentences and remand to the trial court to conduct a new *Miller* hearing and for resentencing.[8]

## G. ISSUE RAISED IN STANDARD 4 BRIEF

Finally, in his Standard 4 brief,[9] defendant challenges the sufficiency of the evidence to support his convictions. We review this challenge de novo, viewing the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find that the

---

[8] Defendant also asserts that imposing a life sentence without the possibility of parole for a murder committed when he was 18 years old "must be categorically barred as constitutionally disproportionate." Because we vacate his sentences and remand for resentencing after a proper *Miller* hearing, we need not reach this issue.

[9] "A 'Standard 4' brief refers to a brief filed on behalf of an indigent criminal defendant pursuant to Michigan Supreme Court Administrative Order No. 2004-6, Standard 4, 471 Mich c, cii (2005)." *Lowrey*, 342 Mich App at 103 n 1.

elements of the offense were proven beyond a reasonable doubt. *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020). "[T]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (citation omitted). The prosecution is not required to disprove every reasonable theory of innocence; it "need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *Kenny*, 332 Mich App at 403.

"The elements of felony murder are (1) the killing of a person, (2) with the intent to kill, do great bodily harm, or create a high risk of death or great bodily harm . . . (3) while committing . . . an enumerated felony." *People v Lane*, 308 Mich App 38, 57-58; 862 NW2d 446 (2014). "The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Bass*, 317 Mich App 241, 268-269; 893 NW2d 140 (2016) (citation omitted). In his Standard 4 brief, defendant does not address any specific element, instead arguing that there was no credible evidence linking him to Atwood's disappearance or death and that other subjects had a motive to kill Atwood.

The prosecution presented sufficient evidence to support defendant's convictions. The evidence presented supported an inference that defendant planned to rob Atwood at gunpoint and then carried out that plan, shooting Atwood in the Trans Am before concealing his body and abandoning the vehicle. Defendant asked another person to join him in the robbery and was the last person seen with Atwood. The motel registrant associated with the Trans Am made telephone calls to defendant's father and a phone number associated with defendant's girlfriend from the motel room. Defendant's DNA was identified on cigarette butts left in the Trans Am, and he had access to a large area where he could have concealed Atwood's body. Additionally, he confessed his involvement to Gant. There was sufficient evidence from which a reasonable trier of fact could find that defendant robbed and killed Atwood and possessed a firearm during the commission of that felony.

## IV. CONCLUSION

We affirm defendant's convictions. We vacate defendant's sentences and remand for a new *Miller* hearing and for resentencing. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Matthew S. Ackerman